UNITED STATES *v.* GENERAL DYNAMICS
CORP. ET AL.

No. 72–402.   Argued December 5, 1973—Decided March 19, 1974

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUG-

488

LAS, J., filed a dissenting opinion in which BRENNAN, WHITE, and MARSHALL, JJ., joined, *post*, p. 511.

*Deputy Solicitor General Friedman* argued the cause for the United States. With him on the briefs were *Solicitor General Bork,* former *Solicitor General Griswold, Assistant Attorney General Kauper, Mark L. Evans,* and *Carl D. Lawson.*

*Reuben L. Hedlund* argued the cause for appellees. With him on the brief were *Hammond E. Chaffetz, Donald G. Kempf, Jr.,* and *Albert E. Jenner, Jr.*

MR. JUSTICE STEWART delivered the opinion of the Court.

On September 22, 1967, the Government commenced this suit in the United States District Court for the Northern District of Illinois, challenging as violative of § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18, the acquisition of the stock of United Electric Coal Companies by Material Service Corp. and its successor, General Dynamics Corp. After lengthy discovery proceedings, a trial was held from March 30 to April 22, 1970, and on April 13, 1972, the District Court issued an opinion and judgment finding no violation of the Clayton Act. 341 F. Supp. 534. The Government appealed directly to this Court pursuant to the Expediting Act, 15 U. S. C. § 29, and we noted probable jurisdiction. 409 U. S. 1058.

I

At the time of the acquisition involved here, Material Service Corp. was a large midwest producer and supplier of building materials, concrete, limestone, and coal. All of its coal production was from deep-shaft mines operated by it or its affiliate, appellee Freeman Coal Mining Corp., and production from these operations

amounted to 6.9 million tons of coal in 1959 and 8.4 million tons in 1967. In 1954, Material Service began to acquire the stock of United Electric Coal Companies. United Electric at all relevant times operated only strip or open-pit mines in Illinois and Kentucky; at the time of trial in 1970 a number of its mines had closed and its operations had been reduced to four mines in Illinois and none in Kentucky.[1] In 1959, it produced 3.6 million tons of coal, and by 1967, it had increased this output to 5.7 million tons. Material Service's purchase of United Electric stock continued until 1959. At this point Material's holdings amounted to more than 34% of United Electric's outstanding shares and—all parties are now agreed on this point—Material had effective control of United Electric. The president of Freeman was elected chairman of United Electric's executive committee, and other changes in the corporate structure of United Electric were made at the behest of Material Service.

Some months after this takeover, Material Service was itself acquired by the appellee General Dynamics Corp. General Dynamics is a large diversified corporation, much of its revenues coming from sales of aircraft, communications, and marine products to Government agencies. The trial court found that its purchase of Material Service was part of a broad diversification program aimed at expanding General Dynamics into commercial, nondefense business. As a result of the purchase of Material Service, and through it, of Freeman and United Electric, General Dynamics became the Nation's fifth largest commercial coal producer. During the early 1960's General Dynamics increased its equity in United

---

[1] United Electric also had coal-mining operations in Utah and other Western States. The Government has not contended, however, that these holdings are of any relevance in this case.

Electric by direct purchases of United Electric stock, and by 1966 it held or controlled 66.15% of United Electric's outstanding shares. In September 1966 the board of directors of General Dynamics authorized a tender offer to holders of the remaining United Electric stock. This offer was successful, and United Electric shortly thereafter became a wholly owned subsidiary of General Dynamics.

The thrust of the Government's complaint was that the acquisition of United Electric by Material Service in 1959 violated § 7 of the Clayton Act [2] because the takeover substantially lessened competition in the production and sale of coal in either or both of two geographic markets. It contended that a relevant "section of the country" within the meaning of § 7 was, alternatively, the State of Illinois or the Eastern Interior Coal Province Sales Area, the latter being one of four major coal distribution areas recognized by the coal industry and comprising Illinois and Indiana, and parts of Kentucky, Tennessee, Iowa, Minnesota, Wisconsin, and Missouri. [3]

---

[2] Section 7 of the Clayton Act reads in pertinent part as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

[3] Testimony at trial indicated that the Eastern Interior Coal Province—the area of coal production upon which the Eastern Coal Province Sales Area was based—was originally named by United States Geological Survey maps of the coalfields in the United States and described one portion of a sequence of coal-bearing rock formations known geologically as the Pennsylvania System. The Sales Area of the Eastern Interior Coal Province was derived from the

At trial controversy focused on three basic issues: the propriety of coal as a "line of commerce," the definition of Illinois or the Eastern Interior Coal Province Sales Area as a relevant "section of the country," and the probability of a lessening of competition within these or any other product and geographic markets resulting from the acquisition. The District Court decided against the Government on each of these issues.

As to the relevant product market, the court found that coal faced strong and direct competition from other sources of energy such as oil, natural gas, nuclear energy, and geothermal power which created a cross-elasticity of demand among those various fuels. As a result, it concluded that coal, by itself, was not a permissible product market and that the "energy market" was the sole "line of commerce" in which anticompetitive effects could properly be canvassed.

Similarly, the District Court rejected the Government's proposed geographic markets on the ground that they were "based essentially on past and present production statistics and do not relate to actual coal consumption patterns." 341 F. Supp., at 556. The court found that a realistic geographic market should be defined in terms of transportation arteries and freight charges that determined the cost of delivered coal to purchasers and thus the competitive position of various coal producers. In particular, it found that freight rate districts, designated by the Interstate Commerce Commission for determining rail transportation rates, of which there were four in the area served by the appellee companies, were the prime determinants for the

assumption, acknowledged in the trial court's opinion, that the high costs of transporting coal—which may amount to 40% of the price of delivered coal—will inevitably give producers of coal a clear competitive advantage in sales in the immediate areas of the mines.

geographic competitive patterns among coal producers. In addition, the court concluded that two large and specialized coal consumption units were sufficiently differentiable in their coal use patterns to be included as relevant geographic areas.[4] In lieu of the State of Illinois or the Eastern Interior Coal Province Sales Area, the court accordingly found the relevant geographic market to be 10 smaller areas, comprising the two unique consumers together with four utility sales areas and four nonutility sales areas based on the ICC freight rate districts.

Finally, and for purposes of this appeal most significantly, the District Court found that the evidence did not support the Government's contention that the 1959 acquisition of United Electric substantially lessened competition in any product or geographic market. This conclusion was based on four determinations made in the court's opinion, id., at 558–559. First, the court noted that while the number of coal producers in the Eastern Interior Coal Province declined from 144 to 39 during the period of 1957–1967, this reduction "occurred not because small producers have been acquired by others, but as the inevitable result of the change in

---

[4] The trial court found that Commonwealth Edison, a large private electric utility with generation facilities in many parts of Illinois, and the Metropolitan Chicago Interstate Air Quality Control Region constituted separate and unique geographic regions. Commonwealth Edison was found to have unique attributes because of the great size of its coal consumption requirements, its distinctive distribution patterns, and its extensive commitment to air pollution programs and the development of nuclear energy. The Chicago Control Region, a congressionally designated area consisting of six counties in Illinois and two in Indiana, was distinguished from other geographic markets because of the impact of existing and anticipated air pollution regulations which would create special problems in the competition for coal sales contracts. 341 F. Supp. 534, 557.

the nature of demand for coal." Consequently, the court found, "this litigation presents a very different situation from that in such cases as United States v. Philadelphia National Bank, 374 U. S. 321 (1963), and United States v. Von's Grocery Co., 384 U. S. 270 (1966), where the Supreme Court was concerned with 'preventing even slight increases in concentration.' 374 U. S., at 365, n. 2." 341 F. Supp., at 558. Second, the court noted that United Electric and Freeman were "predominantly complementary in nature" since "United Electric is a strip mining company with no experience in deep mining nor likelihood of acquiring it [and] Freeman is a deep mining company with no experience or expertise in strip mining." *Ibid.* Third, the court found that if Commonwealth Edison, a large investor-owned public utility, were excluded, "none of the sales by United Electric in the period 1965 to 1967, the years chosen by the Government for analysis, would have or could have been competitive with Freeman, had the two companies been independent," because of relative distances from potential consumers and the resultant impact on relative competitive position. *Ibid.* Finally, the court found that United Electric's coal reserves were so low that its potential to compete with other coal producers in the future was far weaker than the aggregate production statistics relied on by the Government might otherwise have indicated. In particular, the court found that virtually all of United Electric's proved coal reserves were either depleted or already committed by long-term contracts with large customers, and that United Electric's power to affect the price of coal was thus severely limited and steadily diminishing. On the basis of these considerations, the court concluded: "Under these circumstances, continuation of the affiliation between United Electric and Freeman is not adverse

to competition, nor would divestiture benefit competition even were this court to accept the Government's unrealistic product and geographic market definitions." *Id.,* at 560.

## II

The Government sought to prove a violation of § 7 of the Clayton Act principally through statistics showing that within certain geographic markets the coal industry was concentrated among a small number of large producers; that this concentration was increasing; and that the acquisition of United Electric would materially enlarge the market share of the acquiring company and thereby contribute to the trend toward concentration.

The concentration of the coal market in Illinois and, alternatively, in the Eastern Interior Coal Province was demonstrated by a table of the shares of the largest two, four, and 10 coal-producing firms in each of these areas for both 1957 and 1967 that revealed the following: [5]

|  | Eastern Interior Coal Province | | Illinois | |
|---|---|---|---|---|
|  | 1957 | 1967 | 1957 | 1967 |
| Top 2 firms | 29.6 | 48.6 | 37.8 | 52.9 |
| Top 4 firms | 43.0 | 62.9 | 54.5 | 75.2 |
| Top 10 firms | 65.5 | 91.4 | 84.0 | 98.0 |

These statistics, the Government argued, showed not only that the coal industry was concentrated among a small number of leading producers, but that the trend had been toward increasing concentration.[6] Furthermore, the un-

---

[5] The figures for 1967 reflect the impact on market concentration of the acquisition involved here.

[6] The figures demonstrating the degree of concentration in the two coal markets chosen by the Government were roughly comparable to those in *United States* v. *Von's Grocery Co.,* 384 U. S. 270, where

disputed fact that the number of coal-producing firms in Illinois decreased almost 73% during the period of 1957 to 1967 from 144 to 39 was claimed to be indicative of the same trend. The acquisition of United Electric by Material Service resulted in increased concentration of coal sales among the leading producers in the areas chosen by the Government, as shown by the following table: [7]

| | 1959 | | | 1967 | | |
|---|---|---|---|---|---|---|
| | Share of top 2 but for merger | Share of top 2 given merger | Percent increase | Share of top 2 but for merger | Share of top 2 given merger | Percent increase |
| Province ...... | 33.1 | 37.9 | 14.5 | 45.0 | 48.6 | 8.0 |
| Illinois ........ | 36.6 | 44.3 | 22.4 | 44.0 | 52.9 | 20.2 |

Finally, the Government's statistics indicated that the acquisition increased the share of the merged company

---

the top four firms in the market controlled 24.4% of the sales, the top eight 40.9%, and the top 12 48.8%. See *id.*, at 281 (WHITE, J., concurring). See also *United States* v. *Pabst Brewing Co.*, 384 U. S. 546, 551, where the top four producers of beer in Wisconsin were found to control 47.74% of the market, and the top 10 in the Nation and the local three-state area to control 45.06% and 58.93%, respectively. The statistics in the present case appear to represent a less advanced state of concentration than those involved in *United States* v. *Aluminum Co. of America*, 377 U. S. 271, 279, where the two largest firms held 50% of the market, and the top five and the top nine controlled, respectively, 76% and 95.7%; and in *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 365, where the two largest banks controlled 44% of the pre-merger market.

[7] The percentage increase in concentration asserted here was thus analogous to that found in *Von's Grocery, supra*, where the concentration among the top four, eight, and 12 firms was increased, respectively, by 18.0%, 7.6%, and 2.5% as a result of the merger invalidated there. In *Philadelphia Bank, supra*, the 34% increase in concentration in the two largest firms from 44% to 59% was found to be clearly significant. 374 U. S., at 365.

in the Illinois and Eastern Interior Coal Province coal markets by significant degrees: [8]

|  | Province | | Illinois | |
|---|---|---|---|---|
|  | Rank | Share (percent) | Rank | Share (percent) |
| 1959 |  |  |  |  |
| Freeman ............... | 2 | 7.6 | 2 | 15.1 |
| United Electric.......... | 6 | 4.8 | 5 | 8.1 |
| Combined .............. | 2 | 12.4 | 1 | 23.2 |
| 1967 |  |  |  |  |
| Freeman ............... | 5 | 6.5 | 2 | 12.9 |
| United Electric.......... | 9 | 4.4 | 6 | 8.9 |
| Combined .............. | 2 | 10.9 | 2 | 21.8 |

In prior decisions involving horizontal mergers between competitors, this Court has found prima facie violations of § 7 of the Clayton Act from aggregate statistics of the sort relied on by the United States in this case. In *Brown Shoe Co.* v. *United States,* 370 U. S. 294, the Court reviewed the legislative history of the most recent amendments to the Act and found that "[t]he dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy." *Id.,* at 315. A year later, in *United States* v. *Philadelphia National Bank,* 374 U. S. 321, the Court clarified the relevance of a statistical demonstration of concentration in a particular industry and of the effects

---

[8] The 1959 Illinois figure of 23.2% was asserted by the Government to be comparable to the 23.94% share of the Wisconsin beer market found to be significant in *Pabst, supra,* and the 25% share controlled by the merged company in *United States* v. *Continental Can Co.,* 378 U. S. 441, 461. The Province figure of 12.4% was compared with the shares held by the merged companies in *Von's Grocery* (7.5%), and in the *Pabst* national (4.49%) and three-state (11.32%) markets.

thereupon of a merger or acquisition with the following language:

> "This intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Id.,* at 363.

See also *United States* v. *Continental Can Co.,* 378 U. S. 441, 458; *United States* v. *Von's Grocery Co.,* 384 U. S., at 277; *United States* v. *Pabst Brewing Co.,* 384 U. S. 546, 550–552.

The effect of adopting this approach to a determination of a "substantial" lessening of competition is to allow the Government to rest its case on a showing of even small increases of market share or market concentration in those industries or markets where concentration is already great or has been recently increasing, since "if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great." *United States* v. *Aluminum Co. of America,* 377 U. S. 271, 279, citing *United States* v. *Philadelphia National Bank, supra,* at 365 n. 42.

While the statistical showing proffered by the Government in this case, the accuracy of which was not discredited by the District Court or contested by the appellees, would under this approach have sufficed to

support a finding of "undue concentration" in the absence
of other considerations, the question before us is whether
the District Court was justified in finding that other per-
tinent factors affecting the coal industry and the business
of the appellees mandated a conclusion that no sub-
stantial lessening of competition occurred or was threat-
ened by the acquisition of United Electric. We are
satisfied that the court's ultimate finding was not in
error.

In *Brown Shoe* v. *United States, supra,* we cautioned
that statistics concerning market share and concentra-
tion, while of great significance, were not conclusive
indicators of anticompetitive effects:

> "Congress indicated plainly that a merger had
> to be functionally viewed, in the context of its par-
> ticular industry." 370 U. S., at 321–322.
>
> "Statistics reflecting the shares of the market con-
> trolled by the industry leaders and the parties to the
> merger are, of course, the primary index of market
> power; but only a further examination of the par-
> ticular market—its structure, history and probable
> future—can provide the appropriate setting for
> judging the probable anticompetitive effect of the
> merger." *Id.,* at 322 n. 38.

See also *United States* v. *Continental Can Co., supra,*
at 458. In this case, the District Court assessed the
evidence of the "structure, history and probable future"
of the coal industry, and on the basis of this assess-
ment found no substantial probability of anticompetitive
effects from the merger.

Much of the District Court's opinion was devoted to
a description of the changes that have affected the coal
industry since World War II. On the basis of more than
three weeks of testimony and a voluminous record, the
court discerned a number of clear and significant devel-

opments in the industry. First, it found that coal had become increasingly less able to compete with other sources of energy in many segments of the energy market. Following the War the industry entirely lost its largest single purchaser of coal—the railroads—and faced increasingly stiffer competition from oil and natural gas as sources of energy for industrial and residential uses. Because of these changes in consumption patterns, coal's share of the energy resources consumed in this country fell from 78.4% in 1920 to 21.4% in 1968. The court reviewed evidence attributing this decline not only to the changing relative economies of alternative fuels and to new distribution and consumption patterns, but also to more recent concern with the effect of coal use on the environment and consequent regulation of the extent and means of such coal consumption.

Second, the court found that to a growing extent since 1954, the electric utility industry has become the mainstay of coal consumption. While electric utilities consumed only 15.76% of the coal produced nationally in 1947, their share of total consumption increased every year thereafter, and in 1968 amounted to more than 59% of all the coal consumed throughout the Nation.[9]

Third, and most significantly, the court found that to an increasing degree, nearly all coal sold to utilities is transferred under long-term requirements contracts, under which coal producers promise to meet utilities' coal consumption requirements for a fixed period of time, and at predetermined prices. The court described the mutual benefits accruing to both producers and consumers of

---

[9] In 1968, electric utilities accounted for 59.09% of United States coal consumption, coke plants 18.20%, cement mills 1.88%, other manufacturing (including steel and rolling mills) 17.70%, and retail and miscellaneous consumers 3.14%.

coal from such long-term contracts in the following terms:

"This major investment [in electric utility equipment] can be jeopardized by a disruption in the supply of coal. Utilities are, therefore, concerned with assuring the supply of coal to such a plant over its life. In addition, utilities desire to establish in advance, as closely as possible, what fuel costs will be for the life of the plant. For these reasons, utilities typically arrange long-term contracts for all or at least a major portion of the total fuel requirements for the life of the plant. . . .

"The long-term contractual commitments are not only required from the consumer's standpoint, but are also necessary from the viewpoint of the coal supplier. Such commitments may require the development of new mining capacity. . . . Coal producers have been reluctant to invest in new mining capacity in the absence of long-term contractual commitments for the major portion of the mine's capacity. Furthermore, such long-term contractual commitments are often required before financing for the development of new capacity can be obtained by the producer." 341 F. Supp., at 543 (footnote omitted).

These developments in the patterns of coal distribution and consumption, the District Court found, have limited the amounts of coal immediately available for "spot" purchases on the open market, since "[t]he growing practice by coal producers of expanding mine capacity only to meet long-term contractual commitments and the gradual disappearance of the small truck mines has tended to limit the production capacity available for spot sales." *Ibid.*

Because of these fundamental changes in the structure of the market for coal, the District Court was justified in viewing the statistics relied on by the Government as insufficient to sustain its case. Evidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete. In most situations, of course, the unstated assumption is that a company that has maintained a certain share of a market in the recent past will be in a position to do so in the immediate future. Thus, companies that have controlled sufficiently large shares of a concentrated market are barred from merger by § 7, not because of their past acts, but because their past performances imply an ability to continue to dominate with at least equal vigor. In markets involving groceries or beer, as in *Von's Grocery, supra,* and *Pabst, supra,* statistics involving annual sales naturally indicate the power of each company to compete in the future. Evidence of the amount of annual sales is relevant as a prediction of future competitive strength, since in most markets distribution systems and brand recognition are such significant factors that one may reasonably suppose that a company which has attracted a given number of sales will retain that competitive strength.

In the coal market, as analyzed by the District Court, however, statistical evidence of coal *production* was of considerably less significance. The bulk of the coal produced is delivered under long-term requirements contracts, and such sales thus do not represent the exercise of competitive power but rather the obligation to fulfill previously negotiated contracts at a previously fixed price. The focus of competition in a given time frame is not on the disposition of coal already produced but on the procurement of new long-term supply contracts. In this situation, a company's

past ability to produce is of limited significance, since it is in a position to offer for sale neither its past production nor the bulk of the coal it is presently capable of producing, which is typically already committed under a long-term supply contract. A more significant indicator of a company's power effectively to compete with other companies lies in the state of a company's uncommitted reserves of recoverable coal. A company with relatively large supplies of coal which are not already under contract to a consumer will have a more important influence upon competition in the contemporaneous negotiation of supply contracts than a firm with small reserves, even though the latter may presently produce a greater tonnage of coal. In a market where the availability and price of coal are set by long-term contracts rather than immediate or short-term purchases and sales, reserves rather than past production are the best measure of a company's ability to compete.

The testimony and exhibits in the District Court revealed that United Electric's coal reserve prospects were "unpromising." 341 F. Supp., at 559. United's relative position of strength in reserves was considerably weaker than its past and current ability to produce. While United ranked fifth among Illinois coal producers in terms of annual production, it was 10th in reserve holdings, and controlled less than 1% of the reserves held by coal producers in Illinois, Indiana, and western Kentucky. Id., at 538. Many of the reserves held by United had already been depleted at the time of trial, forcing the closing of some of United's midwest mines.[10]

---

[10] The District Court found that while United Electric held six mines operating in the midwest in 1948, it had opened only three new ones since then and four had closed because of exhaustion of reserves. The court found that the evidence showed that reserves in two other mines would soon be depleted, and the appellees inform us in their briefs that these events have already occurred.

Even more significantly, the District Court found that of the 52,033,304 tons of currently mineable reserves in Illinois, Indiana, and Kentucky controlled by United, only four million tons had not already been committed under long-term contracts. United was found to be facing the future with relatively depleted resources at its disposal, and with the vast majority of those resources already committed under contracts allowing no further adjustment in price. In addition, the District Court found that "United Electric has neither the possibility of acquiring more [reserves] nor the ability to develop deep coal reserves," and thus was not in a position to increase its reserves to replace those already depleted or committed. *Id.*, at 560.

Viewed in terms of present and future reserve prospects—and thus in terms of probable future ability to compete—rather than in terms of past production, the District Court held that United Electric was a far less significant factor in the coal market than the Government contended or the production statistics seemed to indicate. While the company had been and remained a "highly profitable" and efficient producer of relatively large amounts of coal, its current and future power to compete for subsequent long-term contracts was severely limited by its scarce uncommitted resources.[11] Irrespective of the company's size when viewed as a producer, its weakness as a competitor was properly

---

[11] As an example of the impact of depleted or committed reserves on a company's ability to compete for long-term contracts, the District Court noted that a number of requirements contracts signed by United Electric to supply coal to electric utilities were backed up by reserves belonging to Freeman and *"could not have been obtained without that guarantee"* because of the utilities' fear that the contract obligation could not otherwise be fulfilled. 341 F. Supp., at 559 (emphasis in original).

analyzed by the District Court and fully substantiated that court's conclusion that its acquisition by Material Service would not "substantially . . . lessen competition . . . ." The validity of this conclusion is not undermined, we think, by the three-faceted attack made upon it by the Government in this Court—to which we now turn.

## III

First, the Government urges that the court committed legal error by giving undue consideration to facts occurring after the effective acquisition in 1959.[12] In *FTC* v. *Consolidated Foods Corp.*, 380 U. S. 592, 598, this Court stated that postacquisition evidence tending to diminish the probability or impact of anticompetitive effects might be considered in a § 7 case. See also *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 597 *et seq.*, 602 *et seq.* But in *Consolidated Foods, supra,* and in *United States* v. *Continental Can Co.*, 378 U. S., at 463, the probative value of such evidence was found to be extremely limited, and judgments against the Government were in each instance reversed in part because "too much weight" had been given to postacquisition events. The need for such a limitation is obvious. If a demonstration that no anticompetitive effects had occurred at the time of trial or of judgment constituted a permissible defense to a § 7 divestiture suit, violators could stave off such actions

---

[12] The court's reliance on such facts and the absence of specific findings of fact concerning the competitive situation in 1959, at which point both sides now agree the acquisition took place, may have been engendered by the Government's apparent inconsistency in its position concerning the critical date. Certain of the appellees' proposed findings of fact concerning United Electric's resources in 1959 and its attempts to increase its depleted holdings were termed "irrelevant" by the Government at the trial.

merely by refraining from aggressive or ·anticompetitive behavior when such a suit was threatened or pending.[13]

Furthermore, the fact that no concrete anticompetitive symptoms have occurred does not itself imply that competition has not already been affected, "for once the two companies are united no one knows what the fate of the acquired company and its competitors would have been but for the merger." *FTC* v. *Consolidated Foods, supra,* at 598. And, most significantly, § 7 deals in "probabilities, not certainties," *Brown Shoe* v. *United States,* 370 U. S., at 323, and the mere nonoccurrence of a substantial lessening of competition in the interval between acquisition and trial does not mean that no substantial lessening will develop thereafter; the essential question remains whether the probability of such *future* impact exists at the time of trial.

---

[13] The mere nonoccurrence of anticompetitive effects from a merger would, of course, merely postpone rather than preclude a divestiture suit. This Court indicated in *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 597, that a merger may be attacked *ab initio* long after its culmination if effect on competition not apparent immediately after the merger subsequently appears, since § 7 was designed to arrest the creation of monopolies " 'in their incipiency' " and " 'incipiency' . . . denotes not the time the stock was acquired, but any time when the acquisition threatens to ripen into a prohibited effect. . . ." See also *FTC* v. *Consolidated Foods Corp.,* 380 U. S. 592, 598. The scope this "time of suit" concept gives to the Government in attacking mergers under § 7 is discussed in Orrick, The Clayton Act: Then and Now, 24 ABA Antitrust Section 44 (1964); Subcommittee on Section 7, The Backward Sweep Theory and the Oligopoly Problem, 32 ABA Antitrust L. J. 306 (1966). In the context of the present case, the "time of suit" rule coupled with the limited weight given to post-merger evidence of no anticompetitive impact tends to give the Government a "heads-I-win, tails-you-lose" advantage over a § 7 defendant: post-merger evidence showing a lessening of competition may constitute an "incipiency" on which to base a divestiture suit, but evidence showing that such lessening has not, in fact, occcurred cannot be accorded "too much weight."

In this case, the District Court relied on evidence relating to changes in the patterns and structure of the coal industry and in United Electric's coal reserve situation after the time of acquisition in 1959. Such evidence could not reflect a positive decision on the part of the merged companies to deliberately but temporarily refrain from anticompetitive actions, nor could it reasonably be thought to reflect less active competition than that which might have occurred had there not been an acquisition in 1959. As the District Court convincingly found, the trend toward increased dependence on utilities as consumers of coal and toward the near-exclusive use of long-term contracts was the product of inevitable pressures on the coal industry in all parts of the country. And, unlike evidence showing only that no lessening of competition has yet occurred, the demonstration of weak coal resources necessarily and logically implied that United Electric was not merely disinclined but unable to compete effectively for future contracts. Such evidence went directly to the question of whether future lessening of competition was probable, and the District Court was fully justified in using it.

Second, the Government contends that reliance on depleted and committed resources is essentially a "failing company" defense which must meet the strict limits placed on that defense by this Court's decisions in *United States* v. *Third National Bank in Nashville,* 390 U. S. 171; *Citizen Publishing Co.* v. *United States,* 394 U. S. 131; and *United States* v. *Greater Buffalo Press,* 402 U. S. 549. The failing-company doctrine, recognized as a valid defense to a § 7 suit in *Brown Shoe, supra,* at 346, was first announced by this Court in *International Shoe Co.* v. *FTC,* 280 U. S. 291, and was preserved by explicit references in the legislative history of the modern amendments to § 7. H. R. Rep. No. 1191, 81st Cong., 1st Sess., 6 (1949); S. Rep. No. 1775, 81st Cong., 2d Sess.,

7 (1950). A company invoking the defense has the burden [14] of showing that its "resources [were] so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure . . . ," *International Shoe, supra,* at 302, and further that it tried and failed to merge with a company other than the acquiring one, *Citizen Publishing Co., supra,* at 138; *Greater Buffalo Press, supra,* at 555.

The Government asserts that United Electric was a healthy and thriving company at the time of the acquisition and could not be considered on the brink of failure, and also that the appellees have not shown that Material Service was the only available acquiring company. . These considerations would be significant if the District Court had found no violation of § 7 by reason of United Electric's being a failing company, but the District Court's conclusion was not, as the Government suggests, identical with or even analogous to such a finding. The failing-company defense presupposes that the effect on competition and the "loss to [the company's] stockholders and injury to the communities where its plants were operated," *International Shoe, supra,* at 302, will be less if a company continues to exist even as a party to a merger than if it disappears entirely from the market. It is, in a sense, a "lesser of two evils" approach, in which the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on competition and other losses if the company goes out of business.[15]

---

[14] In *Citizen Publishing Co.* v. *United States,* 394 U. S. 131, 138–139, "[t]he burden of proving that the conditions of the failing company doctrine have been satisfied" was found to be "on those who seek refuge under it." (Footnote omitted.)

[15] Alternative rationales for the failing-company defense are discussed in Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 339–347 (1960); Com-

The appellees' demonstration of United's weak reserves position, however, proved an entirely different point. Rather than showing that United would have gone out of business but for the merger with Material Service, the finding of inadequate reserves went to the heart of the Government's statistical prima facie case based on production figures and substantiated the District Court's conclusion that United Electric, even if it remained in the market, did not have sufficient reserves to compete effectively for long-term contracts. The failing-company defense is simply inapposite to this finding and the failure of the appellees to meet the prerequisites of that doctrine did not detract from the validity of the court's analysis.

Finally, the Government contends that the factual underpinning of the District Court's opinion was not supported by the evidence contained in the record, and should be re-evaluated by this Court. The findings and conclusions of the District Court are, of course, governed by the "clearly erroneous" standard of Fed. Rule Civ. Proc. 52 (a) just as fully on direct appeal to this Court as when a civil case is being reviewed by a court of appeals. The record in this case contains thousands of pages of transcript and hundreds of exhibits. Little purpose would be served by discussing in detail each of the Government's specific factual contentions. Suffice it to say that we find the controlling findings and conclusions contained in the District Court's careful and lengthy opinion to be supported by the evidence in the record and not clearly erroneous.

One factual claim by the Government, however, goes to the heart of the reasoning of the District Court and thus is worthy of explicit note here. The Government

ment, "Substantially to Lessen Competition . . .": Current Problems of Horizontal Mergers, 68 Yale L. J. 1627, 1662–1668 (1959).

asserts that the paucity of United Electric's coal reserves could not have the significance perceived by the District Court, since all companies engaged in extracting minerals at some point deplete their reserves and then acquire new reserves or the new technology required to extract more minerals from their existing holdings. United Electric, the Government suggests, could at any point either purchase new strip reserves or acquire the expertise to recover currently held deep reserves.

But the District Court specifically found new strip reserves not to be available: "Evidence was presented at trial by experts, by state officials, by industry witnesses and by the Government itself indicating that economically mineable strip reserves that would permit United Electric to continue operations beyond the life of its present mines are not available. The Government failed to come forward with any evidence that such reserves are *presently* available." 341 F. Supp., at 559. In addition, there was considerable testimony at trial, apparently credited by the District Court, indicating that United Electric and others had tried to find additional strip reserves not already held for coal production, and had been largely unable to do so.

Moreover, the hypothetical possibility that United Electric might in the future acquire the expertise to mine deep reserves proves nothing—or too much. As the Government pointed out in its brief and at oral argument, in recent years a number of companies with no prior experience in extracting coal have purchased coal reserves and entered the coal production business in order to diversify and complement their current operations. The mere possibility that United Electric, in common with all other companies with the inclination and the corporate treasury to do so, could some day expand into an essentially new line of business does not depreciate the validity of

the conclusion that United Electric at the time of the trial did not have the power to compete on a significant scale for the procurement of future long-term contracts, nor does it vest in the production statistics relied on by the Government more significance than ascribed to them by the District Court.

## IV

In addition to contending that the District Court erred in finding that the acquisition of United Electric would not substantially lessen competition, the Government urges us to review the court's determinations of the proper product and geographic markets. The Government suggests that while the "energy market" might have been *an* appropriate "line of commerce," coal also had sufficient "practical indicia" as a separate "line of commerce" to qualify as an independent and consistent submarket. Cf. *United States* v. *Continental Can Co.*, 378 U. S., at 456–457. It also suggests that irrespective of the validity of the criteria adopted by the District Court in selecting its 10 geographic markets, competition between United Electric and Material Service within the larger alternative geographic markets claimed by the Government established those areas as a permissible "section of the country" within the meaning of § 7.

While under normal circumstances a delineation of proper geographic and product markets is a necessary precondition to assessment of the probabilities of a substantial effect on competition within them, in this case we nevertheless affirm the District Court's judgment without reaching these questions. By determining that the amount and availability of usable reserves, and not the past annual production figures relied on by the Government, were the proper indicators of future ability to compete, the District Court wholly rejected the Govern-

ment's prima facie case. Irrespective of the markets within which the acquiring and the acquired company might be viewed as competitors for purposes of this § 7 suit, the Government's statistical presentation simply did not establish that a substantial lessening of competition was likely to occur in any market. By concluding that "divestiture [would not] benefit competition even were this court to accept the Government's unrealistic product and geographic market definitions," 341 F. Supp., at 560, the District Court rendered superfluous its further determinations that the Government also erred in its choice of relevant markets. Since we agree with the District Court that the Government's reliance on production statistics in the context of this case was insufficient, it follows that the judgment before us may be affirmed without reaching the issues of geographic and product markets.

The judgment of the District Court is affirmed.

*It is so ordered.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL concur, dissenting.

In this case the United States appeals from a District Court decision [1] upholding the acquisition of stock in United Electric Coal Companies by Material Service Corp. and its successor, General Dynamics Corp., against a challenge that the acquisition violated § 7 of the Clayton Act, 15 U. S. C. § 18.[2] The United States instituted

---

[1] 341 F. Supp. 534 (1972).

[2] Title 15 U. S. C. § 18 provides:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of

this civil antitrust action on the claim that the acquisition may substantially lessen competition in the Illinois and Eastern Interior Coal Province (EICP) sales area coal markets. After trial on the merits the District Court rejected the Government's proposed product and geographic markets and dismissed the action, concluding that the Government had failed to show a substantial lessening of competition in the markets the court deemed relevant.

I

The combination here challenged is the union of two major Illinois coal producers—Freeman Coal Mining Corp. and United Electric Coal Companies—under the ultimate corporate control of General Dynamics Corp. Material Service Corp. acquired all the stock of Freeman Coal in 1942 and began to acquire United Electric stock in 1954. By 1959, holdings in United reached 34%, and Material Service requested and received representation on United's board of directors. As a result, Freeman's president was elected chairman of United's executive committee. "With the affiliation of Freeman and United Electric thus formalized in 1959, common control of the two coal companies was achieved." 341 F. Supp. 534, 537 (1972).

General Dynamics acquired Material Service Corp. in 1959 and moved to solidify the union of Freeman and United by engaging in continued purchases of United's stock throughout the early 1960's. By 1966 it held nearly two-thirds of United's outstanding shares and a successful tender offer increased the holdings to over 90%. In early 1967 United became a wholly owned subsidiary of

another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

General Dynamics. With the 1959 union of Freeman and United Electric thus completed, the Government filed this action challenging the legality of the combination which produced in General Dynamics the Nation's fifth largest coal producer with total annual production of over 14 million tons.

## II

Section 7 of the Clayton Act, the standard against which this combination must be tested, proscribes such combinations "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition . . . ." [3] "Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act . . . ." *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 593 (1957). The court below concluded that "the energy market is the appropriate line of commerce for testing the competitive effect of the United Electric-Freeman combination." 341 F. Supp., at 555. The court rejected the Government's hypothesis of coal as a submarket for antitrust purposes as "untenable," finding that *United States* v. *Continental Can Co.*, 378 U. S. 441 (1964), "compel[s] this court to conclude that since coal competes with gas, oil, uranium and other forms of energy, the relevant line of commerce must encompass interfuel competition." 341 F. Supp., at 556.

I read *Continental Can* to import no such compulsion. That case involved the acquisition of the Nation's third largest producer of glass containers, Hazel-Atlas Glass Co., by Continental Can, the country's second largest producer of metal containers. The District Court found interindustry competition an insufficient predicate for finding a § 7 line of commerce embracing both cans and

---

[3] *Supra*, n. 2.

bottles. We reversed, finding that interindustry competition mandated "treating as *a* relevant product market the combined glass and metal container industries and all end uses for which they compete." 378 U. S., at 457 (emphasis added). But that interindustry market was only one of several lines of commerce in that case. Both parties conceded that "the can industry and the glass container industry were relevant lines of commerce." *Id.*, at 447. Since § 7 proscribes acquisitions which may involve a substantial lessening of competition in *any* line of commerce, the absence of anticompetitive effects in either the bottle or can markets could not sustain the acquisition since there existed *a* market—the glass/metal container market given recognition in this Court—in which the prohibited effect was present.

The District Court here found an energy market in which the combination did not work the prohibited effect. Whatever the correctness of that finding, *Continental Can* teaches us that it is of no help to appellees if there exist other lines of commerce in which the effect is present. Any combination may involve myriad lines of commerce; the existence of an energy market is not inconsistent with and does not negate the existence of a narrower coal market for "within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 325 (1962).

This principle found recognition in *Continental Can* where we recognized glass and metal containers "to be two separate lines of commerce," despite finding that competition between the lines "necessarily implied one or more *other* lines of commerce embracing both industries." 378 U. S., at 456–457 (emphasis added). It was also recognized in *United States* v. *Aluminum Co. of America,* 377 U. S. 271 (1964), which involved the com-

bination of an aluminum conductor manufacturer and a producer of both aluminum and copper conductor. The District Court there refused to treat aluminum conductor as a separate § 7 line of commerce because of the competition between aluminum and copper conductor. Though we found that competition sufficient to justify finding a single aluminum/copper conductor market, we reversed the District Court, holding that the interindustry competition did not preclude "division [of that market] for purposes of § 7 into separate submarkets." *Id.*, at 275.[4]

Coal has both price advantages and operational disadvantages which combine to delineate within the energy market "economically significant submarket[s]."[5] The consumers for whom price is determinative mark out a submarket in which coal is the overwhelming choice; the boundaries of this submarket are strengthened by coal's virtual inability to compete in other significant sectors of the energy market. Energy-use technology in highway and air transportation necessitates the use of liquid fuels. The relative operational ease of dieselized power plants has worked to virtually foreclose coal from the rail transportation market.[6] Despite their higher cost, gas and oil enjoy a competitive edge in the space-heating market because of simple consumer preference for these sources of energy over coal.[7]

The market for coal is therefore effectively limited to large industrial energy consumers such as electric utilities and certain manufacturers with the ability and economic

---

[4] Similarly, in *United States* v. *Philadelphia National Bank,* 374 U. S. 321 (1963), we held commercial banking a § 7 line of commerce even though banks compete with other institutions with respect to some services such as the making of small loans.

[5] See *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 325 (1962).

[6] 341 F. Supp., at 539.

[7] *Ibid.*

incentive to consider coal as an energy source.[8] The court below noted that the "utility market has become the mainstay of coal production," 341 F. Supp., at 539. Within this sector coal's economic advantage yields it an overwhelming share of the market. In each year from 1960 to 1967 (the period during which the Free-man-United Electric union solidified) coal accounted for over 90% of the B.t.u.'s consumed by steam electric utility plants in the EICP sales area; it also provided 74% of the B.t.u.'s consumed by cement plants in the same area and 94% of the B.t.u.'s consumed by such plants in Illinois.[9]

The coal market is therefore viewed by energy con-sumers as a separate economic entity confined to those users with the technological capability to allow the use of coal and the incentive for economy to mandate it. Within that market coal experiences little competition from other fuels since coal's delivered price per B.t.u. in the areas served by Freeman and United Electric is sig-nificantly lower than that for any other combustible fuel except interruptible natural gas which is available only on a seasonal basis.[10] Central Illinois Light Co., for example, purchases coal at 27 cents per million B.t.u.'s,

---

[8] The only other significant use for coal is metallurgical in nature. Metallurgical coal is used as a product in the manufacture of steel. The use of such coal as a product sets it off in a separate market from nonmetallurgical coal which is used as an energy source.

[9] Although nuclear and geothermal power may draw some utility consumers from the coal market in the future, nuclear fuel is not consumable in existing fossil-fuel plants nor is nuclear fuel presently an alternative for nonutility coal consumers. Thus, whatever the future inroads of alternative fuels, there remains a significant class of energy consumers which looks only to coal.

[10] Interruptible gas is sold at a lower rate and is available only when it is not required by firm-rate customers which are supplied according to their needs and which always have priority.

firm natural gas at 45 cents, and oil (for ignition purposes) at 70 cents.[11]  Since coal consumption facilities are unique and not readily adaptable to alternative energy sources, there is little interfuel price sensitivity. As the court in *Kennecott Copper Corp.* v. *FTC,* 467 F. 2d 67, 79 (CA10 1972), stated in finding that "[t]he coal industry is a distinct submarket which has characteristics which are not shared by the other fuel industries," coal prices "are now, and promise to be in the future, subject to the peculiarities of the coal business [since] other fuels appear to have a limited effect."

The competitive position of coal is thus not unlike that of aluminum conductor in *United States* v. *Aluminum Co. of America, supra.*  Like coal, aluminum conductor had "little consumer acceptance" for many purposes, but its substantial price advantage over other conductors gave it "decisive advantages" in those areas of the market where price was "the single, most important, practical factor."  377 U. S., at 275–276.  Despite the existence of some competition from other forms of conductor, those factors were sufficient to set aluminum conductor apart as an economically significant § 7 submarket.  That precedent seems to be indistinguishable; and thus whatever the existence of a § 7 energy market, coal constitutes an economically significant submarket for § 7 purposes.[12]

### III

In rejecting the Government's proposed geographic markets the court below adopted much narrower mar-

---

[11] Oil is used by some coal consumers for purposes to which coal is not suited such as starting up boilers or kilns.

[12] Even the court below gave some recognition to coal as a separate market in its discussion of the relevant geographic markets.  The geographic markets were delineated along "the distributive patterns of . . . coal," separating out those "mines to which *coal* consumers can practicably turn for supplies."  341 F. Supp., at 556 (emphasis added).

kets which, for the most part, followed ICC freight rate districts (FRD's).[13] The justification was that, since ordinary rail rates are the same for all mines in any particular FRD and since transportation costs are the principal competitive factor in coal marketing, mines in one FRD cannot effectively compete for the same customers with mines in other FRD's. Since United Electric's mines are located in the Belleville and Fulton-Peoria FRD's and Freeman's mines are located in the Springfield and Southern Illinois FRD's, the combination of the two companies was found to present no risk of anticompetitive effects.

The error of the District Court in drawing the § 7 sections of the country "so narrowly as to place appellees in different markets" [14] is amply demonstrated by the overlapping distribution patterns of Freeman and United Electric. Though located in different FRD's and thus supposedly not competitive, they sold one-half their output to the same customers at the same facilities. Lack of competition between FRD's is further refuted by the existence of reciprocal selling patterns. For example,

---

[13] Freight rate districts are producing areas grouped for ICC rate-making purposes; all mines within each producing area are accorded the same rates to the same consuming destinations. See *Ayrshire Collieries Corp.* v. *United States,* 335 U. S. 573, 576 (1949). The other markets accepted by the District Court are Commonwealth Edison and the Metropolitan Chicago Interstate Air Quality Control Region. Commonwealth Edison was found to be unique in light of its massive coal requirements, its purchasing patterns which are "quite distinct from [those] followed by other consumers," and its singularly extensive commitment to nuclear energy. The MCIAQC, consisting of six Northeastern Illinois counties and two Northwestern Indiana counties, was found unique because of its singular access, through water and rail arteries, to almost all FRD's in the Midwest.

[14] See *United States* v. *Philadelphia National Bank,* 374 U. S., at 361.

while United's Belleville FRD mine was selling 25% of its output to customers in the Southern Illinois FRD sales area, Freeman was selling 20% of its Southern Illinois FRD coal to Belleville sales area customers.

The inability of the lower court's narrow markets to " 'correspond to the commercial realities' " [15] of the distribution patterns displayed in the record is explained by the undue weight given ordinary rail rates. While transportation costs are significant, ordinary rail rates are not the single controlling element of transportation costs. First, not all rail shipments are governed by FRD rates; many of the most significant shipments are transported via "unit trains" carrying only coal from a particular producer to a particular customer pursuant to a negotiated rate. Thus Freeman ships Southern Illinois FRD coal by unit train to a Belleville FRD sales area customer at a cost *lower* than any Belleville FRD rate to that location. Second, not all coal transportation proceeds by rail. United transports most of its coal by barge, and in 1967 only one-half of all the coal sold in the five States which receive coal from Illinois was transported by all-rail shipments.

Normal rail rates are thus not so limiting as to eliminate substantial competition between FRD sales areas. Coal producers may constitute strong competitive factors in areas up to 500 miles from the mine. Thus in 1967 Freeman's Southern Illinois FRD Orient Mine shipped over 1.5 million tons of coal to customers 300 to 500 miles away. At the same time, United's Fidelity Mine, only 40 miles from the Orient, shipped more than one million tons, over half its total production, to equally distant locations. Both Freeman and United Electric have mines which are capable of supplying any point in the EICP sales area.

---

[15] See *Brown Shoe Co.* v. *United States,* 370 U. S., at 336.

Further, even assuming the existence of FRD markets, I think the court below erred in rejecting the Government's proposed markets. As with product markets, § 7 does not necessitate an anticompetitive effect in any particular geographic market; its proscription reaches combinations which may substantially lessen competition in *any* section of the country. Thus, whatever the correctness of the District Court in finding FRD markets, the lack of anticompetitive effect in those markets is of no help to General Dynamics if competition may be lessened substantially in other geographic markets. And, as with product markets, the existence of FRD markets is not inconsistent with the existence of a myriad of other sometimes overlapping markets. Thus, in *United States* v. *Pabst Brewing Co.,* 384 U. S. 546 (1966), we found Wisconsin, the Wisconsin-Michigan-Illinois tristate area, and the entire United States all to be relevant § 7 sections of the country in which to assess anticompetitive impact.

While existing sales patterns show that transportation costs are not as restrictive as the District Court found, long-range transportation costs and the national distribution of coal deposits serve to divide the country into regionally significant coal markets. Both Freeman and United Electric are located in the EICP, consisting of Central and Southern Illinois, Southwestern Indiana, and Western Kentucky, and parts of other nearby areas. The region overlies a geologically united coal-bearing rock sequence which is estimated to contain 36% of the Nation's total coal resources. Because of the separation of the region from other major producing regions,[16]

---

[16] The Nation's other major coal producing regions are: (1) the Eastern Coal Province of Western Pennsylvania, West Virginia, Eastern Kentucky, and parts of Ohio, Tennessee, and Alabama; (2) the Western Interior Coal Province comprised of Central Iowa, Northern and Western Missouri, and Eastern Oklahoma; and (3) scat-

EICP producers enjoy a substantial competitive edge with respect to sales in an area composed of Illinois, Indiana, Western Kentucky, parts of Tennessee, Eastern Iowa, Southeastern Minnesota, Southern Wisconsin, and extreme Eastern Missouri. In 1967, 82% of EICP coal was sold in this area. Freeman sold over 93% of its coal and United Electric sold over 97% of its coal in this area.

Within the EICP sales area, Illinois stands as an economically significant submarket. In 1967, 82% of the coal consumed in Illinois came from Illinois mines and 58% of the coal mined in the State was used there. Freeman sold 42% of its coal and United Electric sold 62% of its coal to Illinois consumers, more than either company sold in any other State. Since Illinois sales are dominated by Illinois producers and since all relevant Freeman and United Electric Mines are located in Illinois,[17] the State constitutes a relevant and significant market for § 7 purposes. Although economic lines do not fall precisely along political boundaries, the Government is not required to delineate § 7 markets by "metes and bounds." *United States* v. *Pabst Brewing, supra,* at 549. In holding a four-county group a relevant geographic market in *United States* v. *Philadelphia National Bank,* 374 U. S. 321 (1963), we noted the artificiality of such political boundaries but held that "such fuzziness would seem inherent in any attempt to delineate the relevant geographic market." *Id.,* at 360 n. 37. The State of Wisconsin was held a relevant market in *Pabst Brewing, supra,* and in *United States* v. *El Paso Gas Co.,* 376 U. S. 651, 657 (1964), we held that there could be "no

_____

tered deposits in Montana, Wyoming, Colorado, and Utah. Jurisdictional Statement 5.

[17] United Electric also controls some coal deposits in Colorado and Oklahoma which are not in issue in this case. 341 F. Supp., at 538 n. 8.

doubt that California is a 'section of the country' as that phrase is used in § 7."

## IV

While finding no violation of § 7 in the Freeman-United Electric combination, the District Court did not make clear the standard used in reaching that ultimate conclusion. The court did not mention what it thought to be the relevant market shares nor did it discuss the effect of the combination on industry concentration. The court merely found that Freeman and United Electric do not compete because they are located in different FRD geographic markets, and because they sell different types of coal. As already discussed, nearly all the mines of both companies are located in Southern Illinois, and as demonstrated by past distribution patterns, with an ability to compete effectively at distances up to 500 miles, their presence in different minute FRD's within Southern Illinois has simply *not* rendered them noncompetitive. The differences in the types of coal sold, moreover, are irrelevant. It is true, as the court below notes, that United Electric sells strip-mined coal while Freeman extracts deep reserves, but the fact that the companies sold half their output to common customers demonstrates that at least a significant portion of the consuming public is understandably unconcerned with the details of extraction. While it is also true that only Freeman sells metallurgical coal and a byproduct known as dust, this says nothing more than that the companies do not compete in metallurgical coal or dust; it does not relieve the court of the responsibility for evaluating the anticompetitive effects in nonmetallurgical coal production—production which accounts for 100% of United's and 92% of Freeman's business.[18]

---

[18] The lack of competition from United for a mere 8% of Freeman's business is simply irrelevant. In *United States* v. *Aluminum*

The court further found that United Electric, standing alone, would not contribute meaningfully to further competition since virtually all its economically mineable strip reserves were committed under long-term contracts and it possessed neither the capability to obtain more strip reserves nor the expertise to develop its deep reserves. Although the doctrine was not invoked by name, this appears to be an application of the "failing company" defense. See *Citizen Publishing Co.* v. *United States,* 394 U. S. 131 (1969). If it is, the court proceeded on an analysis made at the wrong time and failed to discuss the legal standards employed in finding the defense to be established. The finding that 48 of United's 52 million tons of strip reserves were committed related to the time of trial. But, since the rationale of the failing-company defense is the lack of anticompetitive consequence if one of the combining companies was about to disappear from the market at any rate, the viability of the "failing company" must be assessed as of the time of the merger. *United States* v. *Greater Buffalo Press,* 402 U. S. 549, 555 (1971); *Citizen Publishing Co.* v. *United States, supra,* at 138.

The Court urges that United's weak reserve position, rather than establishing a failing-company defense, "went to the heart of the Government's statistical prima facie case based on production figures." Under this view United's weak reserve position at the time of trial constitutes postacquisition evidence which diminishes the possibility of anticompetitive impact and thus directly affects the strength of time-of-acquisition findings. The problem

---

*Co. of America,* 377 U. S. 271 (1964), we struck down a combination which affected competition in the aluminum conductor market, and that result was not affected by the irrelevant fact that one of the companies, Rome Cable, also engaged in the production of copper conductor.

with this analysis is that the District Court made no time-of-acquisition findings which such postacquisition evidence could affect. The majority concedes the obvious need for a limitation on the weight given postacquisition evidence and notes that we have reversed cases where "too much weight" has been given. Here the postacquisition events were given *all* the weight because *all* the District Court's findings were made as of the time of the trial. While findings made as of the time of the merger could concededly be tempered to a limited degree by postacquisition events, no such findings were ever made.

Many of the commitments here which reduced United's available reserves occurred after the acquisition; 21 million tons for example were committed in 1968. Similarly, though the District Court found further mineable strip reserves unavailable at the time of trial, there is no finding that they were unavailable in 1959 or 1967. To the contrary, the record demonstrates that other coal producers did acquire new strip reserves during the 1960's.[19] United's 1959 viability is further supported by the fact that it possessed 27 million tons of deep reserves. While we do not know if all these reserves were economically mineable at the time of the acquisition, there was no finding that they would not become so in the near future with advances in technology or changes in the price structure of the coal market.[20] Further there was no contention or finding that further deep reserves were not available for acquisition.[21] The District Court

[19] See Brief for United States 71.

[20] Research into new methods of extraction or a rise in the price of coal could make reserves which are uneconomical to mine at any given time economically mineable in the future.

[21] To the contrary, United Electric acquired substantial new deep reserves after the time of the acquisition since it now owns about 44 million tons of deep reserves and controls by location another 40 to 50 million tons. Reserves are controlled by location if, in

merely concluded that United had no "ability to develop deep coal reserves." [22]

While it is true that United is a strip-mining company which has not extracted deep reserves since 1954, this does not mean that United would not develop deep-mining expertise if deep reserves were all it had left or that it could not sell the reserves to some company which poses less of a threat to increased concentration in the coal market than does Freeman. United Electric was not, as the Court suggests, merely one of many companies with the possible "inclination and the corporate treasury" to allow expansion into "an essentially new line of business." United was a coal company with a thriving coal-marketing structure. At the time of the merger it had access to at least 27 million tons of deep reserves and it had operated a deep mine only five years previously. While deep-coal mining may have been an essentially new line of business for many, it was for United merely a matter of regaining the expertise it once had to extract reserves it already owned for sale in a market where it already had a good name.

---

order to be mined at all, they must be mined by those who control, by ownership, lease, or option, the contiguous reserves.

[22] If that conclusion is to lend support to the combination on the ground that United "standing alone, cannot contribute meaningfully to competition," it must be made in light of the stringent standards applicable to the failing-company defense. In *Citizen Publishing Co.* v. *United States*, 394 U. S. 131, 138–139 (1969), we said that the defense is one of "narrow scope" and that the burden of proving the defense is "on those who seek refuge under it." We also stated that the prospects of continued independent existence must be "dim or nonexistent" and that it must be established that the acquiring company is the only available purchaser. See also *United States* v. *Greater Buffalo Press*, 402 U. S. 549, 555–556 (1971), and *United States* v. *Third National Bank in Nashville*, 390 U. S. 171, 189 (1968).

## V

Thus, from product and geographic markets to market-share and industry-concentration analysis to the failing-company defense, the findings below are based on legal standards which are either incorrect or not disclosed. While the court did gratuitously state that no § 7 violation would be found "even were this court to accept the Government's unrealistic product and market definitions," this conclusory statement is supported by no analysis sufficient to allow review in this Court. The majority notes that production figures are of limited significance because they include deliveries under long-term contracts entered into in prior years. It is true that uncommitted reserves or sales of previously uncommitted coal would be preferable indicia of competitive strength, but the District Court made *no* findings as to United's or Freeman's respective market shares at the time of the acquisition under either of these standards.[23]

---

[23] The District Court did find that, as of 1968, Freeman controlled 6.5% of the total coal reserves dedicated to existing mines in the EICP. At the same time, United Electric controlled 2.5% of that total, but almost all of this was contractually committed. If market shares are to be determined by percentage of total reserves, what is necessary is a finding as to each company's 1959 share of uncommitted Illinois and EICP reserves—including reserves which were economically mineable or which might have become so in the reasonably near future and further including an estimate as to uncontrolled reserves which might have been acquired by either company in the reasonably near future.

The District Court also found that, as of 1968, the two companies together accounted for 10.9% of the EICP coal production, and that this figure represented more than a 10% decrease from the combined production for 1959. Combined 1959 production by the companies was thus at least 12.1% of the EICP total. If market shares are to be determined by percentage of industry sales, this figure is in excess of percentages found illegal in markets with a trend toward concentration (see, *e. g.*, *United States* v. *Von's Grocery Co.*, 384 U. S. 270

On the basis of a record so devoid of findings based on correct legal standards, the judgment may not be affirmed except on a deep-seated judicial bias against § 7 of the Clayton Act. We should remand the case to the District Court with directions to assess the impact of the Freeman-United Electric combination on the Illinois and EICP sales area coal markets as of 1959.[24] We should direct the court to make findings of respective market shares, and further to evaluate United Electric's viability as an independent producer or as the possible "acquiree" of a company other than General Dynamics as of 1959, in light of the strict standards applicable to the failing-company defense. Since we abdicate our duty for responsible review and accept the mere conclusion that no § 7 violation is established on the basis of a record with none of these necessary ·findings, I dissent from the affirmance of the District Court's judgment.

---

(1966) (7.5%), and *United States* v. *Pabst Brewing Co.*, 384 U. S. 546 (1966) (4.49%)), and the court below recognized an increase in concentration in the coal market. It might be argued, however, that, if market share is to be determined by sales, the production figures found by the court below are not the relevant ones for they include production which goes to meet obligations incurred in long-term contracts entered into in prior years. In terms of competition, if sales are the relevant criteria, what is needed is a finding of "new" sales (sales of previously uncommitted coal) as a percentage of total industry new sales in Illinois and the EICP at the time of the acquisition.

[24] Common control of the two companies was achieved in 1959 and the combination was completed in 1967; at oral argument both parties conceded that the merger "took place" in 1959.