**UNITED STATES of America**

v.

**AMAX, INC. and Copper Range Company.**

**Civ. No. H–75–263.**

United States District Court,
D. Connecticut.

Oct. 24, 1975.

John W. Clark, Vincent Alventosa, L. Peter Farkas, U. S. Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

Richard M. Reynolds, Day, Berry & Howard, Hartford, Conn., John L. Warden, Carroll E. Neesemann, Janette Patterson, Sullivan & Cromwell, New York City, for Amax, Inc.

David P. Lighthill, Corp. Counsel, New York City, Howard K. Fuguet, William L. Patton, Edward B. Hanify, Ropes & Gray, Boston, Mass., for Copper Range Co.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This action, seeking to enjoin the contemplated merger of the defendants, Amax, Inc. and the Copper Range Company, was filed by the United States of America on August 25, 1975. Jurisdiction exists pursuant to § 15 of the Clayton Act, 15 U.S.C. § 25.

After a pre-trial conference, held on September 2, 1975, the defendants voluntarily agreed to postpone the closing of the merger pending the result of an expedited hearing on the merits. A four-day trial was held from September 16–19, 1975, at which the Government presented two witnesses and a large amount of documentary material, and the defense presented four witnesses. The majority of factual issues were settled by stipulation before the trial.[1]

As this action is based on § 7 of the Clayton Act, the Government bears the burden of proving by a preponderance of the evidence that "in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."[2]

The parties stipulated that the relevant "section of the country" was the United States as a whole. They further stipulated that the two relevant "lines of commerce" were domestic mine production and the business of refining copper. They agreed that the proper measure of domestic mine production was the amount of copper produced. However, as will be discussed later, they strongly disagreed as to the proper measure of market shares in the refined copper line of commerce.

### I. Domestic Mine Production

There is little or no factual dispute regarding this line of commerce. The dispute centers around the probable effect of the merger. In 1973,[3] Copper Range controlled 4.6 per cent of the United States' domestic mine production of copper, and ranked as the nation's seventh largest producer.[4]

In that same year Amax entered the mining industry through the initiation of a joint venture agreement with the Anaconda Copper Co., in the operation of an open pit copper mine at Twin Buttes, Arizona. During the last six months of 1973, Amax ranked as the eleventh largest producer, with a market share of 1.4 per cent.[5] That percentage remained unchanged during 1974.[6] Amax is the smallest significant producer in the copper mining industry.

1. The parties are to be commended for the attitude and ability with which they presented this case. Recognizing the importance of the issues and the benefits of prompt determination, they worked harmoniously in a professional atmosphere devoid of the tactical delay, harassment and pettiness which often characterizes major litigation. They were able to stipulate to uncontested facts and to narrow the issues to the minimum necessary for decision. Due in large part to their efforts, this "major" antitrust action has been tried, and after thorough consideration has been decided, in only a fraction of the time normally required for this type of litigation.

2. Clayton Act § 7, 38 Stat. 731, as amended, 64 Stat. 1125, 15 U.S.C. § 18. The relevant paragraph of that section reads:
 "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

3. Due to widespread labor stoppages in the copper industry during 1974, which affected various corporations to different degrees, this court relies chiefly on figures from 1973. *Tr.* 59–60. When figures from other years are used they are so identified.

4. *Stipulation*, Table A. At the trial Dr. Leaming, the Government's expert witness, explained that Cyprus Mines and Utah International Union Corporation are in reality separate shareholdings in one corporation, and should therefore more properly be listed jointly as the sixth largest producer. *Tr.* 59.

5. *Stipulation*, Table A.

6. *Stipulation*, Table B.

The mining industry is highly concentrated. The four largest companies control 66.9 per cent of the market and the eight largest control 89.9 per cent.[7] There are only eleven significant producers.[8]

Should this merger be completed, the resulting company will possess a 6 per cent market share. The number of significant producers will be reduced from eleven to ten and the market share of the eight largest firms will increase to 91.3 per cent.[9]

The Government contends that these figures satisfy the necessary finding that the merger would produce a company controlling an undue percentage share of the market, and would result in a significant increase in the concentration of firms in that market. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). In addition, the Government has attempted to bolster its position with evidence concerning the barriers to entry to the copper mining industry, the existence of less anticompetitive alternatives to the merger, and the announced intention of Amax to increase its production and consequently its market share. In its post-trial brief the Government has also urged this court to view Amax as occupying a position analogous to that of a "potential entrant," and to weigh the effect of the merger's alleged elimination of potential competition.

Barriers to entry to the copper mining industry are extremely high, even higher than to the refining industry due to the expense of locating and purchasing mineral rights to copper deposits. Amax' own entry into the industry is evidence of those barriers. In order to make its entry, Amax in effect purchased the right to enter into a joint venture with the Anaconda Company. It has been able to increase its potential reserves through a similar arrangement with the

Kennecott Copper Company. It is not at this time the sole owner of any copper mine.

■ The Government's second point is that there are ways in which Amax could expand its copper production, *e. g.*, internal expansion, which would be less anticompetitive than merging with another substantial competitor in an already concentrated industry. However, this argument can be made, at least in theory, against any horizontal merger, and § 7 of the Clayton Act has not been interpreted to outlaw all such mergers. In order to prohibit this merger, this court must find that its effect may be to *substantially* lessen competition.

Finally, the Government points to Amax' extensive acquisition of potential reserves and quotes from its 1974 Annual Report:

> "Over the next few years AMAX plans to expand its capacity to mine, refine and market copper, lead, zinc, molybdenum and nickel. . . . The principal capital expenditures have been scheduled for the United States . . . ." [10]

Based on these factors the Government offers a two-pronged argument. First, it contends that in addition to Amax' current market share, this court should consider its expansion plans in determining the potential effect of the merger on competition. Second, it contends that although Amax has already entered the copper mining industry, its announced plans to expand have an effect on that industry analogous to that of a potential entrant. Thus, allowing the merger to destroy that effect would in itself violate the Clayton Act.

The problem with both of these arguments is that they are basically speculative. Amax is not poised on the edge of the market waiting (or appearing to wait) for the optimum time for entry. Rather, it is already a significant producer, subject to the same risks and op-

7. *Id.*

8. *Tr.* 72.

9. *Stipulation*, Table B.

10. Amax, Inc., *1974 Annual Report*, 2.

portunities as the other major copper producers. Amax is not the only producer promising its shareholders to increase capacity.[11] And as a producer it has suffered the types of unexpected setbacks in its attempts to increase capacity which make its predictions merely that and no more.[12]

There is nothing in the record to support a contention that Amax is substantially more likely than any other major producer to expand its market share. The Government, in short, is asking this court to make a double assumption. The *Philadelphia Nat'l Bank* test allows the Government to make a limited factual showing if it can prove the two requirements of an undue percentage share and a significant increase in concentration. This abbreviated showing is based on an assumption which stems from those statistics, *i. e.*, that given those figures, the merger is "inherently likely to lessen competition substantially."[13] In this case, the Government asks this court to make not only that assumption, but also the assumption that the production figures presented, although not representing an undue share at the present time, will shortly become an undue share because of Amax' commitment to expansion. That, to use the talismanic phrases, is to ask that this court adopt "ephemeral possibilities" rather than the "probability" which § 7 requires. *United States v. Marine Bancorporation*, 418 U.S. 602, 623, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *Brown Shoe Co. v. United States*, 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

The Government's argument that Amax should be viewed as a potential entrant suffers from the same defect, because a prediction of Amax' ability to significantly increase its position can only be based on speculation. In addition, the Government has failed to prove one of the three necessary elements of a § 7 case dependent on the elimination of potential competition, *i. e.*, that prior to its entry, or in this case, prior to its expansion, Amax had or has any pro-competitive effect on the other members of the copper mining industry.

"In developing and applying the doctrine, the Court has recognized that a market extension merger may be unlawful if the target market is substantially concentrated, if the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential *de novo* entrant, and if the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market." *United States v. Marine Bancorporation*, 418 U.S. at 624–25, 94 S.Ct. at 2871.

■ Assuming, *arguendo*, that, although these three conditions explicitly apply only to *de novo* entry, they are not so limited, the Government presented no evidence at trial which would tend to show that Amax' expansion plans have in any way influenced the competitive behavior of any of the other members of the industry. Given the extensive evidence concerning the nature of the "producer pricing" system, which will be discussed in detail below, the weight of the evidence is to the opposite effect. As a result this court finds that in the copper mining line of commerce, the 6 per cent market share of the resulting corporation would not be "undue," and that the Government has failed to bear its burden of proving that the merger, if completed, may substantially lessen competition.

---

11. *See, e. g.*, The Anaconda Co., *1974 Annual Report*, 9; Aluminum Smelting & Refining Co., *1974 Annual Report*, 5; Phelps Dodge Corp., *1974 Annual Report*, inside cover.

12. Compare the 1973 predictions in Amax, Inc., *1973 Annual Report*, 16; with the unpredicted results the next year, Amax, Inc., *1974 Annual Report*, 6.

13. 374 U.S. 363, 83 S.Ct. 1741.

## II. The Refined Copper Line of Commerce

### A. Capacity as the proper measure of market share and concentration.

As was stated above, the parties stipulated that the production of refined copper was a proper line of commerce for purposes of Clayton Act analysis. They strongly disagreed, however, on the appropriate measure of market shares and concentration within that line of commerce. The defendants contend that this court should find that sales are the appropriate measure of market position in the refined copper industry. They rely on the testimony of their expert witness that the use of sales is preferable, and on the fact that the majority of the decided antitrust cases, as well as the Department of Justice's own *Merger Guidelines,* use sales as the ordinary measure of market share.[14] If sales were used it would reduce by almost half the market share which the Government, using refining capacity as the measure, alleges Amax would control after the merger.[15]

Initially, it should be stated that capacity is not an *improper* measure of market share.[16] It was, for example, the measure used in *United States v. Aluminum Co. of America,* 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964). Not coincidentally, that case involved the fabrication of aluminum, a field quite similar to the refined copper business at issue in this suit. *See also United States v. Bethlehem Steel Corp.,* 168 F. Supp. 576, 604–07 (S.D.N.Y.1958).

The question then becomes which measure most meaningfully describes the industry so as to enable this court to assess the probable effect of the merger. For a number of reasons it is the judgment of this court that market share measured by capacity yields a more satisfactory and meaningful result.

As will be discussed more fully, the copper refining industry is an oligopoly, characterized by a high degree of vertical integration. Many of the major refiners also own substantial fabrication facilities, and not surprisingly, these fabricators purchase their refined copper from the producers who control them. These are not sales in an open market sense, since both the prices and amounts of the transfers can be manipulated for tax or inventory considerations, and do not necessarily reflect an accurate picture of the market positions of the various companies.

An additional problem is that the use of sales as a measure would not reflect the importance of "tolling" in the industry. Although tolling copper, *i. e.,* refining it for the account of another, represents a profitable use of refining capacity, it would not be reflected in the market position of the refiner if sales were used as the measure.

On the other hand, the Government's expert witness, an economist, testified that "in the long run" capacity is a superior measure of market position because it includes the potential modification by the refiner of both inventories

---

14. "The market is ordinarily measured by primarily the dollar value of the sales or other transactions . . . ."
 *Merger Guidelines,* 7. However the Guidelines make exceptions for fields where another measure would be more accurate, *e. g.,* total deposits in the field of commercial banking.

15. In 1973, Amax accounted for 3.2 per cent of the domestic sales of refined copper. Copper Range accounted for 3.1 per cent. *Stipulation,* Table F. Accepting this measure would also, by definition, accept the defendants' arguments concerning the proper allocation of copper tolled for another company's account. *See* text, *infra,* at 962–963.

16. "Congress neither adopted nor rejected specifically any particular tests for measuring the relevant markets, either as defined in terms of product or in terms of geographic locus of competition, within which the anticompetitive effects of a merger were to be judged. Nor did it adopt a definition of the word "substantially," whether in quantitative terms of sales or assets or market shares or in designated qualitative terms, by which a merger's effects on competition were to be measured."
 *Brown Shoe Co. v. United States,* 370 U.S. 294, 320–21, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

and production.[17] This testimony was contradicted by the defendants' expert witness, but the weight of his opinion was undercut by the fact that he was the chairman of a governmental subcommittee organized to study the copper industry which chose in its final report to use capacity as a measure of concentration in that industry.[18]

Finally, there was some evidence at trial that some refiners had been reducing their output to maintain prices, in response to the current low prices available in the copper industry. The concept of market position includes, among other powers, the power to manipulate production and sales independently of economic forces. Using capacity as the measure of market position enables one to obtain a picture of the structure of the industry, unclouded by current manipulations which may be practiced by those who operate within the market.

B. *The relevance of refining on toll.*

■ The parties' second disagreement concerning measurement of concentration and market share is the proper treatment of Amax' use of its refining capacity to refine copper "on toll" for the accounts of others.

Purchases of copper scrap and the output of its own smelter comprise about half of the basic material which Amax processes at its Carteret, New Jersey, refinery. In addition, Amax receives shipments of copper scrap from various fabricators which it refines and then returns to the owner, for which service it levies a "tolling charge." Historically, the Carteret Refinery has been run on a 1 to 1 ratio of copper refined for sale by Amax and copper refined by Amax on toll for others. During 1974, the percentage of tolled copper was as high as 60 per cent.[19]

Amax contends that whether sales or capacity are used for the measure of its share of the refining market, that portion of its share which represents tolling done for others should properly be allocated to the market share of the owner (and seller) of the refined copper, and that Amax can be found to control only the proportion of its output which it actually sells.

As was mentioned above, if this court were to use sales as the appropriate measure, it would by definition exclude copper which had been toll refined since Amax would not be the seller of that copper. Since this court has determined that capacity gives a more accurate picture of the power exercised by each company in the market, and is therefore a more appropriate measure of market share, it must still decide to whom to allocate the capacity used for toll refining.

Dr. Houthakker, Amax' expert witness, testified that this use of capacity should not be allocated to Amax. However, this testimony was clearly based on his opinion that sales were the appropriate measure of market share, and that the sale of copper which had been toll refined was controlled by the owner of the copper and not by Amax.[20]

When the refining process is analyzed in terms of use of capacity, it is clear that it is unimportant whether that capacity is used to refine copper for Amax itself to sell or for another to sell. Refining on toll is the functional equivalent of refining for one's own account and selling the refined copper back to the party from whom the copper scrap was originally purchased.[21]

---

17. *Tr.* 124.

18. *Report of the Subcommittee on Copper to the Cabinet Committee on Economic Policy,* 13 May 1970, at 6. (Hereinafter *Copper Report*).

19. *Stipulation* ¶ 19; Amax, Inc., *1974 Annual Report,* 5.

20. *Tr.* 501.

21. If Amax were to charge a customer a toll charge of ten cents per pound for refining his scrap, it would be the equivalent of purchasing the scrap from the customer at 60 cents per pound and selling the refined copper back to him at 70 cents per pound. In either case Amax controls the use of its capacity and the charge it wishes to levy for the use of that capacity.

The equivalence of these practices is further supported by the fact that the fabricator who chooses to have his copper scrap toll refined does not receive back the exact copper refined from his scrap. Scrap refined on toll and scrap purchased by Amax are commingled during the refining process.

The fact that these two practices compete against each other is evidenced by testimony at trial that copper fabricators decide whether to have their scrap tolled or to sell it to the refiner on the basis of the prices of scrap and refined copper[22] and the extent of their own inventories at the time the decision is made.[23]

If the question is analyzed in terms of control of capacity, it is clear that Amax is able to determine whether its capacity will be allocated to refining on its own account, tolling, or, if it were to desire, inactivity, so as to reduce the capacity available. This is accomplished by modifying its decisions to purchase or to toll, or by varying its toll charges or the price it pays for scrap. It is this control which the court is seeking to measure in its calculations of market share and concentration in the industry, and for this reason the capacity which Amax currently devotes to toll refining must be included in the measure of its market position.[24]

C. *The structure of the copper industry.*

The copper refining industry is an oligopoly. Testimony by both of the expert witnesses outlines in detail the evidence which led them to their conclusions concerning the absence of competition in the industry.[25]

The relevant statistical information was presented in the stipulation.[26] There are only nine significant firms in the industry.[27] The top four firms in the industry, the "majors," control 71.4 per cent of the capacity in the industry. The top eight control 93.3 per cent.

■ The strongest indication of the oligopolistic nature of the industry, however, is the existence of the two-price system, and, specifically, the existence of the "producer price." This is the price at which the majority of producers, including all of the majors, sell their refined copper. It is set by the producers without negotiation with their customers and is maintained for a period of time —usually a month. When a price adjustment is made by one of the majors, it is matched by all those producers who follow the system within a short period of time. This ability of a small group of producers to set prices independent of competition and without regard for the classic economic forces of supply and demand is almost a textbook description of an active oligopoly.

It is true that some copper producers sell their product at a so-called "free market" price which reflects the supply and demand for the product. However, only a small number of producers charge this price, and their competitive effect on the industry is very small at the present time. Amax is, at present, one of these independent producers. Copper Range abandoned the producer price and became an independent in early 1974.

It was the existence of the two-price system, as well as the importance of copper as a commodity to the national welfare, which led to the in-depth government study of the copper industry by

---

22. *Tr.* 173, 410.

23. *Tr.* 415.

24. Amax is not the only company which toll refines copper. *See, e. g., PX–4,* at 5. Capacity figures for all companies reflect the capacity which they currently allocate to tolling or which they could allocate to tolling at any future time, if they should so desire.

25. Dr. Houthakker, the defendants' expert, disagreed only as to the extent to which the industry was an oligopoly. His theory of the two segments of the copper industry will be discussed *infra* at 967–969.

26. *Stipulation,* Table D.

27. *Tr.* 72.

the subcommittee chaired by Professor Houthakker.[28]

This merger must therefore be judged in the context of an industry which is an accomplished oligopoly. The "parallel policies of mutual advantage, not competition," which the Supreme Court foresaw emerging in the aluminum cable industry in *United States v. Aluminum Co. of America,* 377 U.S. at 280, 84 S.Ct. 1283, already exist in the copper industry. The Clayton Act interests which must be protected in this action are not only those which forbid increasing concentration within a given industry, but perhaps even more importantly, those which in the case of an already highly concentrated industry, preserve and encourage the potential deconcentration of that industry. *United States v. Philadelphia Nat'l Bank,* 374 U.S. at 365, n. 42, 83 S.Ct. 1715.

D. *The effect of the merger on competition in the refining industry.*

The proposed merger would join Amax, the fifth largest refiner in the industry, with a 9.1 per cent share of the market, and Copper Range Company, the seventh largest refiner, with a 3.2 per cent share of the refining industry. The resulting company, possessing 12.3 per cent of the capacity of the industry, would be the fourth largest refiner, moving ahead of the Anaconda Company.

The merger would reduce the number of significant refiners from nine to eight and would increase the concentration of market control among the top four from 71.5 per cent to 73.4 per cent. The top eight would control 95.8 per cent.

In an industry which has as few substantial competitors and is as highly concentrated as is the copper industry, these figures alone are sufficient to satisfy the two-part test of an undue percentage share and a significant increase in concentration, set out in *United States v. Philadelphia Nat'l Bank,* 374 U.S. at 363, 83 S.Ct. 1715.

The market structure in the copper industry is similar to that of the aluminum cable industry, which was detailed in *United States v. Aluminum Co. of America.* In that case the acquisition of a company with only a 1.3 per cent share of the market was held to violate the Clayton Act, even though it resulted in no greater concentration in the industry.

The defendants seek to distinguish *Alcoa* in two ways. First, they attempt to limit it to an acquisition of a smaller competitor by the industry leader. On the facts of this case, this distinction is not properly applicable. The firm resulting from the present merger would be the fourth largest in an industry historically controlled by the top four or five. The effect of a merger on the structure of an industry is just as invidious if the resulting firm becomes a leader in the industry as when the acknowledged leader further entrenches itself.

Second, the defendants urge that *Alcoa,* and for that matter most of the decisions which prevented horizontal mergers, necessarily relied on a finding of a tendency toward concentration, an historical diminution in the number of viable competitors. In the copper industry, the defendants point out, the trend is the reverse, with a total of four new entries into the industry since 1971.[29]

28. *Copper Report, supra* note 18, at 1.

29. At the threshold there is some question about the significance of the entries which have been made in the refining industry. The most significant entry was made by the Magma Copper Co., currently the sixth largest refiner, with a 7 per cent market share. However, this was the result of vertical integration by one of the four largest copper miners, Newmont Mining Corporation, an acknowl-

edged member of the copper oligopoly. The three other entrants, only one of which can be regarded as significant, were copper fabricators attempting to integrate backwards. Testimony was introduced at trial that these latter entries were attempts by fabricators to break the "bottleneck" which exists at the refining stage of the industry. *Tr.* 67–68. Finally, one of the four entrants is not now operating its refinery. *Stipulation,* Table C.

■ It is not surprising that cases decided under a statute intended to halt what Congress perceived to be a nation-wide tendency toward concentration would frequently deal with that factor. However, the tendency toward concentration was originally considered simply "another factor" tending to lend "additional support" to a decision concerning the probable effect of a merger.[30] The fact that a tendency toward concentration is a relevant factor does not mean that it is an essential element in establishing the illegality of a merger.[31] That would be to ignore the second important purpose behind § 7 of the Clayton Act: preserving the possibility of future deconcentration in industries which had already reached near oligopoly structure. This purpose has been emphasized by the Supreme Court in two decisions. *United States v. Philadelphia Nat'l Bank*, 374 U.S. at 365, n. 42, 83 S.Ct. 1715; *United States v. Aluminum Co. of America*, 377 U.S. at 279, 84 S. Ct. 1283.

The structure of the copper industry presents an even more compelling case than did the aluminum industry in *Alcoa*. There the Supreme Court found that the aluminum cable industry *may* have been oligopolistic. That industry consisted, as does the copper industry in this case, of only nine significant producers. However, as testimony in the present case has proven, the copper industry *is* now an accomplished oligopoly, with a non-competitive pricing system, as a result. According to testimony at the trial, six of the nine significant producers sell their copper at their substantially identical producer prices without negotiation with their customers.[32]

This structure evidences a concentration high enough to meet the limits established in *Philadelphia Nat'l Bank*, which would "prevent[ing] even slight increases in concentration and so preserve[ing] the possibility of eventual deconcentration." 374 U.S. 365, n. 42, 83 S.Ct. at 1742. Here the oligopoly is already so strong that industrial consumers have been forced to overcome substantial entry barriers and integrate backward to insure themselves a supply of an essential product at a reasonable price. This new entry which potentially marks the beginning of deconcentration in the industry should not be a signal to the other firms in the industry that they are free to increase the concentration to levels higher than those which prevailed before it occurred.

Thus, the defendants' second argument overstates the importance of a tendency toward concentration and undervalues the second important policy underlying the Clayton Act: the eventual deconcentration of industries already highly concentrated.

Although there is sufficient reason to conclude, solely on the basis of the structure of the industry, that the effect of this merger would be both to substantially lessen actual competition and to reduce the potential for future deconcentration in the copper refining industry, that decision is further supported by the additional facts proven at trial which make it even more likely that the threatened diminution will occur.

E. *Additional anti-competitive aspects of the copper refining industry.*

In attempting to predict the potential effect of a merger on competition within

---

30. *Brown Shoe Co. v. United States*, 370 U.S. at 344–45, 82 S.Ct. 1502.

31. *NBO Industries Treadway Companies, Inc. v. Brunswick Corp.*, 523 F.2d 262 (3d Cir. 1975), is not *contra*. That decision also lists "the historical tendency in the industry toward concentration or lack of such a tendency," as an additional "factor" which must be considered in a § 7 case. But the court goes on to say, "While the quantitative substan-

tiality of the market shares is important in a case involving a merger of horizontal competitors, it is far less important here because Brunswick was not previously in any of the three markets." At 274–275.

32. Asarco, Kennecott, Phelps Dodge, Anaconda, Newmont (Magma), and Inspiration. *Tr.* 353–54. These six account for 81 per cent of the refinery capacity in the industry. *Stipulation*, Table D.

an industry it is necessary to consider structural characteristics of that specific industry which are likely to increase or decrease that effect. The nature of the judicial system severely limits the extent to which such an investigation can be made, and this limitation has been recognized by the Supreme Court, in permitting an abbreviated evidentiary showing, *United States v. Philadelphia Nat'l Bank*, 374 U.S. at 362–63, 83 S.Ct. 1715. In this case both parties were able to submit additional evidence concerning the unique nature of the copper industry. After consideration of this evidence, this court has concluded that, in addition to satisfying its burden of proof under the *Philadelphia Nat'l Bank* test, the Government has proven additional factors concerning the copper industry which compel the further conclusion that the anti-competitive effect of this merger, inferable from the structure of the industry, will be especially aggravated in its effect on the market for refined copper.

The first of these factors is the severity of the entry barriers to the refining industry. Construction of new refining facilities requires extensive capital outlay as well as access to a source of blister to be refined.[33] For example, one of the two companies which have made significant entries since 1971 was already a major copper miner and the second was a joint venture between a major copper fabricator and a copper miner. Furthermore, there was evidence that these entry costs have substantially increased due to stricter environmental controls over refineries and smelters.

A second factor, which aggravates the lack of competition, is the extensive network of interrelated stock holdings among the nominal competitors within the industry, and of business relationships, joint ventures, etc., resulting from the large amount of capital needed for expansion.[34] These relationships were cited by the *Copper Report* as one cause of the unsatisfactory economic performance of the copper industry.[35]

The third factor is the allocation system used by the major producers and its effect on the fabricators who make up the market for refined copper. Because of the two-tier price system for copper, it is possible for fabricators to compete against each other by purchasing refined copper at significantly different prices. Since the free market price for copper is highly variable, there are frequent periods when the producer price is significantly lower.[36] During these periods, suppliers who sell at the producer price allocate their supply among the various fabricators. A "position," *i. e.,* a secure allocation, with a producer is a much sought-after asset among fabricators. The decision concerning the size and existence of the allocation is made on the basis of the "loyalty" of the fabricator, *i. e.,* by his willingness to continue to purchase his allocation when the producer price exceeds the free market price.[37] Fabricators who choose to buy at the lowest price may find themselves without an allocation. They may also lose their allocation if they compete too strongly against a fabricator owned by one of the major producers.[38] As the defendants' economic expert testified, the effect of the allocation system has

---

33. Electrolytically refined copper and fire refined copper are generally the product of a three-step process. The first step, referred to as "milling," involves the process of crushing, grinding and floating copper ore to separate minerals from each other and from associated waste material. The product of the milling process is known as copper "concentrates," and generally contains about 25 per cent copper. The second step, referred to as "smelting," involves the heat treatment of copper concentrates to produce "blister" which contains about 99 per cent copper. The third step, the "refining" process, produces a product which is nearly 100 per cent pure copper. *Stipulation* ¶ 15.

34. *See, Findings of Fact* 74–84.

35. *Copper Report, supra* note 18, at 14.

36. Graph, Amax Exhibit 5.

37. *Tr.* 445–46.

38. *Copper Report, supra* note 18, at 16.

been to make independent fabricators the equivalent of franchisees of the major producers.[39]

■ Given this picture of an oligopolistic industry, insulated by high entry barriers, able to work together due to a complex interrelationship of business ventures and stock holdings, and not surprisingly, demonstrating performance results which evidence almost no competitive behavior, it is clear that this merger threatens the future of competition in this industry enough to make it a violation of § 7 of the Clayton Act.

## III. Defenses

### A. The two-segment theory.

Other than denying that capacity was the proper measure of the line of commerce and that toll refining was properly included in Amax' measure of market share, the defendants generally agreed to the facts and description of the refining industry as outlined above. Most of that description is derived from the stipulation of the parties.

However, the defendants disagreed as to the proper interpretation and weight to be given to the facts. Their first defense was based upon an interpretation of the industry put forward by Dr. Houthakker. This interpretation described the copper refining industry as necessarily divided into two segments, oligopolists and independents, with members of each segment identified by their pricing policies.

■ Dr. Houthakker described the industry as an oligopoly under challenge by a small group of independent refiners, who, although without significant impact on pricing policy at the present time, would, if they were able to remain active in the market and to expand supply, eventually provide some positive competitive effect.[40]

In effect, the defense argued that market concentration, for purposes of applying the *Philadelphia Nat'l Bank* test to this merger, should not be measured by the concentration of the industry as a whole but by the lesser degree of concentration within the "independent" segment.

This argument suffers from two obvious weaknesses, both of which the defendants attempted to counter. The first is that it would be foolish to use only independents to measure effect if one effect of the merger would be to allow or to encourage two of the independents to join as one additional member of the oligopoly. The second is that if concentration is to be measured only among independents, it would be logical to measure market share also solely as a share of the independent segment of the market.

In answer to the first objection, the defendants asserted that the very fac-

---

39. *Tr.* 446.

40. Amax presented evidence at trial to support its contention that the ultimate result of the merger would be pro-competitive. It argued that its landholdings in Northern Michigan, interspersed with those of Copper Range, could be more profitably worked after the merger to expand supply. The Government responded that some of this land was already being worked by Copper Range under a licensing agreement with Amax. Amax also argued that its ability to withstand swings in copper prices would allow a more stable employment of Copper Range's assets. The Government countered this evidence with proof of other potential merger partners for Copper Range. Finally, Amax presented evidence of its plans to expand production at the White Pine mine. The Government answered with documents proving that at the time of the merger Copper Range's future plans included greater capital expenditures than Amax had intended.

In any event, this court holds that once it has concluded that the merger would tend to substantially lessen competition according to the standards enacted by Congress and defined by the Supreme Court, evidence of additional economic effects of the merger, which on some value scale might be considered pro-competitive, are no longer relevant. *United States v. Philadelphia Nat'l Bank*, 374 U.S. at 371, 83 S.Ct. 1715; *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 617–18 (S.D. N.Y.1958).

tors which underlie the producer pricing system make it most unlikely that Amax, whether allowed to merge or not, would ever abandon its free market pricing system.

The basis of this position is the assertion that the major purpose of the producer pricing system is to exert power in the copper fabrication market and to protect the fabricators owned by the producers from competition from independents. The argument then runs that since Amax owns no fabricators it would have no purpose in joining the producer pricers.

There are several problems with this argument. The first and most important is that it is unsupported by the evidence. Dr. Houthakker himself testified that not all of the major producers in fact own fabricators.[41]

Additionally, there is a history of vertical integration in the copper industry from mining through smelting and refining to the fabrication stage.[42] This factor is relevant to any decision concerning the likelihood that Amax would, in the future, vertically integrate into copper fabrication. Also to be considered is the current practice of an Amax subsidiary, Ametalco, Inc., which sells, as an agent, almost half of the output of the Cyprus-Pima Mining Co. at the producer price.[43]

Finally, as a result of the merger Amax would obtain sole ownership of Hussey Metals Corporation, a copper fabricator and a wholly-owned subsidiary of the Copper Range Company.[44] It is not therefore fair to say that Amax would have no interest in copper fabrication after the merger.

The second factor on which Dr. Houthakker based his opinion that Amax would not join the copper oligopoly was his belief that a prerequisite to selling at the producer price is a large secure source of copper. At the present time Amax is highly dependent upon purchases of scrap for its supply of unrefined copper and is therefore unlikely to be able to change its pricing system.[45]

This theory is not supported by the evidence either. Professor Houthakker answered under cross examination that Asarco, the largest domestic refiner, adheres to the producer price system yet is as heavily dependent upon scrap purchases for its supply as is Amax.[46] In addition, the merger, as related above, would make Amax the seventh largest copper miner, with a 6 per cent share of the mining industry. Even if Professor Houthakker's opinion as to the basis for the producer price system were valid, the evidence showed that even before the merger Copper Range Company had sufficient reserves and a sufficient interest in fabrication to be able to sell at the producer price. It is unreasonable to believe that after the merger Amax will be lacking in either one or the other.

The second objection to the defendants' two-segment theory is that if concentration should be measured in two segments then market share and the effect of the merger should also be measured in that manner.[47] If market share is measured solely among the independents, as defined by the defendants,

41. *Tr.* 437. Professor Houthakker testified as follows:
 "Q. Do the major producers generally have interest [*sic*] in copper fabrication operations?
 "A. That is true of the three most major producers: Kennecott, Phelps Dodge, Anaconda."

 An examination of the *1974 Annual Report* of the Newmont Mining Corporation, *PX*–9, discloses no interest in copper fabrication.

42. *Copper Report, supra* note 18, at 6.

43. *Tr.* 209.

44. *Tr.* 176.

45. *Tr.* 448.

46. *Tr.* 491–92.

47. *See, United States v. Aluminum Co. of America*, 377 U.S. at 280–81, 84 S.Ct. 1283. Rome Cable Corporation, the acquired company, possessed only a 1.3 per cent share

the effect of the merger will be to join Amax, the largest independent, with Copper Range, the second largest independent, to form a company which controls 65 per cent of the independent market.[48] This result would clearly violate the Clayton Act.

The defendants do not accept this line of reasoning. They argue that although one has to consider the effect of the two segments when measuring concentration, one cannot properly measure the effect of the merger in just the independent segment of the industry because of the competition afforded the independents by copper imported from foreign countries.[49]

There are several problems with this argument. The first is that it is based on sales, rather than capacity, as the proper measure of market share. Dr. Houthakker testified that imports are relevant in measuring the effect of the merger but exports are not, because he would measure their effect on sales in the United States.[50] Even with that understanding however, the future effect of imports, even on sales, is open to serious question due to the admitted uncertainty of foreign sources of supply.[51]

If the analysis is restricted to capacity as the measure, the existence of foreign capacity cannot be considered in estimating the potential effect of this merger. This is because the parties have stipulated that the United States is the relevant geographical market in which concentration and market share are to measured. That stipulation is based on

evidence that even in the face of Government encouragement, "reverse tolling," or sending blister to foreign countries for refining, is not currently employed to any significant extent.[52]

Finally, the argument concerning the limitation imposed by foreign imports must be rejected as a matter of law. If the effect of the merger is to lessen competition to the point where the members of the industry enjoy a cushion, allowing them to raise their prices above the price set by a truly competitive market, it does not matter whether that cushion is so large that the price can be raised almost to the level the oligopolistic segment of the industry has set *ex parte,* or, if it is only large enough to take into consideration the increased transportation costs which affect foreign suppliers, it is sufficiently anti-competitive to violate the policies of the antitrust legislation. *United States v. Aluminum Co. of America,* 148 F.2d 416, 426 (2d Cir. 1945).

In short, the defendants cannot have it both ways. If they wish to exclude Amax and Copper Range from the admitted oligopoly of the refining industry, they must justify the potentially devastating impact of allowing the two largest independents to merge. They have failed to negate the likelihood that the resulting company will either join the oligopolistic segment of the industry, or, at least, bask in its protection, taking with it 65 percent of the actual or potential competition posed by the independent segment of the industry.

---

of the relevant market. The Supreme Court noted that while it ranked ninth and eighth in the two sub-markets, it ranked fourth as an independent.

48. In his testimony, John Towers, Executive Vice President of Amax, Inc., gave an incomplete list of the producers who sell at the producer price. *Tr.* 353–54. Even assuming that the seven remaining refiners are independents who price on the free market sys-

tem, Amax controls 48 per cent of that market. Copper Range controls 17 per cent.

49. *Tr.* 467–68, 513–14.

50. *Tr.* 460–61.

51. *Tr.* 152, 346–47, 515–18; *Copper Report, supra* note 18, at 19.

52. *Tr.* 523–24; *Copper Report, supra* note 18, at 24–25.

■ B. *The "General Dynamics" Defenses.*[53]

This court cannot ignore the additional analysis made necessary in a Clayton Act suit by the decision in *United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). The defendants in this action certainly have not done so.

This court cannot rest with its conclusion that the probable effect of this merger would be to substantially lessen competition in the copper refining industry without examining the evidence put forward by the defendants which tends to prove that the statistical evidence upon which the Government chiefly relies does not accurately represent the ability of these two companies to compete in the future.

1. *The economic condition of Copper Range Company.*

Much evidence was presented at trial concerning the current financial status of Copper Range Company, and the prospect that, due to large losses, it may not be able to continue as a viable competitor in the mining or refining industries.

The unusual geological structure of the ore body at the company's mine at White Pine, Michigan, requires the company to employ an underground mining technique known as room and pillar mining.[54] This technique requires that pillars, containing ore, be left underground to support the roof of the mine and the weight of the overburden. As a result, Copper Range is able to recover only about 60 per cent of the ore in the mine. Due to these factors the White Pine mine suffers the competitive disadvantage of being among the highest cost mines in the domestic copper industry.[55]

However, the defendants do not rely on the "failing company" defense.[56] Since there was extensive evidence submitted concerning alternative potential merger partners for Copper Range, it is clear that they could not have fit into that exception as it has been narrowly construed by the Supreme Court. *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969).

Instead, the defendants claim that, although Copper Range Company may not be failing, there is a substantial possibility that its copper mining operations and therefore its copper refining facilities will be forced to discontinue operations in the near future. From this they contend that the figures representing its current share of the mining and refining markets do not accurately represent its future competitive position.

■ This court holds as a matter of law that even if the above were true it would be inadequate as a defense to an action under § 7 of the Clayton Act. Under the guidelines set down by *General Dynamics* this court must analyze the present and future competitive strength at the "focus of competition." 415 U.S. 501, 94 S.Ct. 1186. In *General Dynamics* the "focus of competition" in the coal industry was determined to be the procurement of long-term supply contracts and it was found as a question of fact that United Electronics' known coal reserves were almost completely committed and that therefore it lacked the necessary product with which it could compete.

53. As a procedural matter, this court holds that the evidentiary showing allowed the defendants in a Clayton Act suit under the decision in *United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed. 2d 530 (1974), is a defense, and as a result, once the Government has established a *prima facie* showing of illegality under § 7, the defendants bear the burden of proving by a preponderance of the evidence that the statistical evidence put forward by the Government in support of its case fails to accurately portray the future competitive position of one of the parties to the merger.

54. All other copper mines in the United States employ the open pit mining technique. *Tr.* 147–48, 236–50.

55. *Stipulation* ¶ 12.

56. *Tr.* 265–66.

■ In this case, this court has determined that the "focus of competition" in the mining industry is the potential production of copper concentrate and in the refining industry the potential production of refined copper, measured in terms of refining capacity. There has been no proof by Copper Range that it lacks the wherewithal to compete in either of those markets. There is no question as to the extent of its reserves or the accuracy of the competitive position portrayed by its refining capacity. On the contrary, there has been abundant testimony that a company with adequate financial reserves could "ride over" the current lull in copper prices and profitably compete in the future with Copper Range's reserves and refining capacity.[57] The fact that it may not be Copper Range Company itself which does the competing in the future is irrelevant. The purpose of the Clayton Act is to protect *competition*, not *competitors*. *Brown Shoe Co. v. United States*, 370 U.S. at 320, 82 S.Ct. 1502. *And see, United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226 (C.D. Cal. 1973), *aff'd mem.* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

Even if the financial situation of Copper Range were an adequate defense to this action, this court would hold that the defendants have failed to meet their burden of proof on this issue. There was extensive evidence that prices and profits have historically been subject to severe fluctuation.[58] This court is unwilling to attempt to find as a fact the price at which copper will sell in the future. But it does accept the fact that, while perhaps not accurate for short or medium term analysis, six cents per pound margin of profit, termed a "conservative" estimate by the president of Copper Range,[59] accurately represents the future anticipated profits of the Copper Range Company.

2. *Refining capacity available for future competition by Amax.*

■ A more serious contention is that raised by Amax concerning the accuracy of the 9.1 per cent share of refining capacity and its utility in estimating Amax' future competitive ability. Amax has 260,000 tons of annual capacity for the production of refined copper in its refinery at Carteret, New Jersey.[60] However, this total is the combination of two different refining methods, electrolytic refining and fire refining.[61] At its Carteret plan Amax has 175,000 tons of annual electrolytic capacity and 85,000 tons of fire refining capacity. Fire refining is a more limited process and cannot remove certain metallic impurities. As a result, only certain high-grade blisters can be used in the fire refining process. Copper Range Company has only fire refining capacity, but the White Pine mine is one of only two copper mines in the country which produces a concentrate pure enough for fire refining.

---

57. *Tr.* 266–67.

58. Mr. Ensign, President and Chief Operating Officer of Copper Range Company, testified that 1974 was the best year that the company had ever experienced in net income. *Tr.* 276. This was shortly after he had testified that at his current cost of production and with copper prices at the present 60 cents per pound, Copper Range would be out of money between August and October, 1976. *Tr.* 264–65. It was this fluctuation which motivated Copper Range to look for merger partners whose earnings were not subject to that degree of fluctuation. *Tr.* 277. There is no evidence that this historical fluctuation will not continue or turn into a prolonged down period. All of the evidence submitted, including the projections of all the companies in the industry are, in fact, to the opposite effect, predicting an upturn in demand and higher prices.

59. *Tr.* 313–15 ; *P.X–*16, at 1.

60. Amax also owns a refinery at Port Nickel, La., which produces refined copper and nickel from a special · imported concentrate. The production of this refinery is already committed to export under a long-term contract. *Tr.* 341. As a result, the capacity of that refinery was not used in computations in this case. *Stipulation*, Table D ; *Tr.* 344–45.

61. A third method of refining, electrowinning, exists, but does not figure substantially in the figures of refining capacity. *Stipulation* ¶ 15.

Prior to 1974, Amax obtained the blister for its fire refining capacity from mines in Chile and Peru. However, those sources of blister are no longer available and there was testimony that Amax has no present alternative sources for high-grade blister.[62] As a result Amax contends that the refining capacity figure of 260,000 tons (9.1 per cent) used in the stipulation is misleading, and that in order to achieve an accurate picture of its future ability to compete, the fire refining capacity must be subtracted from that total. This would leave Amax with a total of 175,000 tons of annual capacity, or a 6.3 per cent market share.

This contention must also be rejected, and on the same two grounds as was the contention put forward by Copper Range Company. As a question of law, this court would be prepared to hold that in an industry as highly concentrated as is the copper refining industry,[63] a merger which resulted in a combined market share of 9.5 per cent,[64] given the continuous warnings against even small increases in concentration,[65] would also violate § 7 of the Clayton Act.

However, once again this court finds that the defendants have failed to meet their burden of proof on this defense. While the court accepts and in fact relies on the proven instability of foreign sources of supply,[66] it does not agree that no other sources of high-grade blister exist. As a result of this merger, if it were to be completed, Amax would obtain the resources of the White Pine mine, one of the two domestic sources of acceptable blister. Amax also owns mineral rights to deposits interspersed with those at White Pine.[67] In addition, Amax already owns a copper deposit at Wakefield, Michigan, only 20 miles from the White Pine location.[68] These three sources of high-grade blister could more than occupy the fire refining capacity at Carteret.[69]

In addition to the possibility of refining high-grade blister, there is the possibility of refining copper scrap, some of which can be fire refined. Testimony showed that Copper Range was considering devoting as much as 13 per cent of its capacity to processing clean copper scrap which it had purchased or on toll for others.[70]

62. *Tr.* 346–48.

63. The reduction of 2.8 per cent in Amax' market share due to this adjustment would result in an increase in the market share of each of the other companies in the industry, proportional to their share as shown in the stipulation.

64. This figure, supplied by Amax, representing their adjusted figure of 6.4 per cent and Copper Range's 3.1 per cent, does not take into consideration the increase in Copper Range's market share due to the calculation in note 63, *supra.*

65. *United States v. Philadelphia Nat'l Bank,* 374 U.S. at 365, n. 42, 83 S.Ct. 1715; cited in *United States v. Aluminum Co. of America,* 377 U.S. at 279, 84 S.Ct. 1283; in turn cited in *United States v. General Dynamics Corp.,* 415 U.S. at 497, 94 S.Ct. 1186.

66. *See* note 51, *supra.*

67. *Tr.* 338.

68. *Tr.* 339. The court is assuming that the two deposits, only 20 miles apart, are of the same purity. Even if this geology is faulty, the presence of the additional deposit goes to the economies of scale potentially reflected in transportation costs, and is not essential to the holding.

69. Mr. Towers testified that the blister could not economically be transported to Carteret and refined there. *Tr.* 340–41. This testimony is confusing since for the cost figure Mr. Towers uses the cost of transportation and *electrolytic* refining. What is at issue is the potential for *fire* refining, which as has been found, is a less expensive process. *Tr.* 308. If it was Mr. Towers' intention to testify that the added cost of transporting the blister from the mine at White Pine to the refinery at Carteret would make the resulting refined copper uncompetitive in price, this court finds that testimony unconvincing in light of Mr. Towers' own testimony that blister had previously been obtained from Peru and Chile (*Tr.* 346), Professor Houthakker's testimony as to the low freight charges for shipping copper (*Tr.* 458), and the evidence concerning the distances over which copper concentrates are in practice shipped in this country (*PX–* 12).

70. *Tr.* 318.

Amax' own figures showed that although it claimed to be able to use only its 175,000 tons of electrolytic capacity, it produced 222,289 tons of copper in 1973,[71] and increased that amount to 231,900 tons in 1974.[72] In answer to these points, Mr. John Towers, the Executive Vice-President of Amax, testified that the explanation, both of Carteret's production and Copper Range's proposed venture, was that there was in fact no "refining" taking place, but that "No. 1 Scrap," which has insignificant or no impurities, was simply being melted and recast.[73]

However, regardless of whether the process is in fact refining or is "simply" melting and recasting, it represents a profitable use of refinery capacity, which is the line of commerce with which this court is concerned. Amax and Copper Range purchase the scrap and put it through the same process as they do their own blister. The resulting copper is commingled and sold at the same price.[74] There is no basis in fact on the evidence produced upon which to distinguish the two processes as they have been described here.[75]

Consequently this court concludes that there is substantial evidence that Amax will be able to utilize its 85,000 tons of fire refining capacity in the future, and that that figure is properly included in the calculation of its market share.

**C. Capacity in foreign countries.**

Finally, the defendants argue that the capacity figures accepted by this court reflect neither capacity located abroad dedicated to refining copper for export to the United States, nor Amax' capacity dedicated to refining for export from the United States. They assert that these factors have to be included in an accurate assessment of the domestic refining industry.

 The latter is clearly irrelevant since Amax' decision to export is strictly a business decision within its sole control. As this court is not measuring the refining market by sales, the ultimate location of the sale of the refined copper is irrelevant. It is Amax' control over the use of its capacity which is being challenged, and that control is not affected by the export of its product.

As for capacity located abroad, that is outside the geographical market stipulated by the parties. The potential relevance of this capacity would not, however, be, as Amax contends, that the copper refined abroad would be *sold* in the United States. Rather, that capacity might represent a competitive alternative for the producers of blister or the tollers of scrap to the refining capacity located within the United States. Although this alternative was considered dence that it is currently a significant in the *Copper Report*,[76] there is no evi- factor in the industry.[77] As for the fu-

71. *Stipulation*, Table E.

72. Amax, Inc., *1974 Annual Report*, 5.

73. *Tr.* 349–52.

74. *Tr.* 371.

75. In its post-trial brief Amax argues that Table D in the stipulation is inaccurate in that it fails to reflect the unidentified capacity for melting and recasting copper controlled by other than copper refiners. The short answer to this contention is that Amax stipulated to copper refining as the line of commerce and stipulated to the figures and percentages on Table D as those which accurately represent the capacity of the industries within that line of commerce. The longer answer is that if there is a difference in

the "refining" and "melting and recasting" processes as they occur within the refineries at White Pine and Carteret, and of that this court expresses no opinion, the fact that the refining process competes profitably with the melting and recasting process does not mean that the reverse is true. *Cf. United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Since there has been no proof that melting and recasting competes with refining, the undisclosed amounts of melting and recasting capacity in this country are not relevant to this decision.

76. *See* note 52, *supra*.

77. *Id.*

ture, there was substantial evidence to the effect that foreign refining and imports of refined copper cannot be relied upon to favorably influence domestic competition.[78]

## IV. *Conclusion and Relief*

Based on the findings of fact and the conclusions of law, as outlined in this opinion, it is the conclusion of this court that a merger between the defendants Amax, Inc. and the Copper Range Company would tend to substantially lessen competition in the copper refining industry in the United States.

The Government has proven by a preponderance of the evidence that the merger would result in a company with an undue market share, and in a significant increase in the already high concentration of the industry. In addition, the Government has gone beyond this to prove that the copper industry's high entry barriers, interrelated stock and business relationships, and history of oligopolistic performance, are likely to aggravate the anti-competitive effects of this particular merger. Therefore, the merger, if it were to occur, would be in violation of § 7 of the Clayton Act.

In its prayer for relief the Government has requested both an injunction, pursuant to § 15 of the Clayton Act, 15 U.S.C. § 25, and an order to compel Amax to divest itself of its stock ownership in Copper Range. As a result of this court's conclusion as to the illegality of the proposed merger, the injunction will be granted. However, the Government has failed to introduce any evidence that the 20 per cent stock owner-

ship of Copper Range has in any way allowed Amax to *control* Copper Range,[79] or is in effect a *de facto* merger for purposes of the Clayton Act. Consequently a divestiture order will be denied.

The foregoing, together with Findings of Fact separately filed contemporaneously herewith, constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

The parties shall present a proper order to this court within ten days.

So ordered.

78. *See note 51, supra.*

79. There was undisputed evidence that Amax purchased its 20 per cent interest in Copper Range in the 1950's, and that the purchase was for investment purposes. *Tr.* 338. The two companies have no common directors, officers or employees. *Stipulation* ¶ 5. There were two items which might lead to an inference of some control. The first is that Mr. Ensign, the current president of Copper Range, moved to that company from Amax in 1961, after Amax had become a substantial

shareholder. *Tr.* 234. To draw an inference from this fact alone, without further proof, would be highly speculative. The second fact is evidence that one potential merger partner with Copper Range, Cerro Company, asked Mr. Ensign if it could discuss a potential merger between it and Copper Range with Amax. *Tr.* 285. This can be just as readily explained as a desire to get the approval of a major shareholder before going ahead with serious merger discussions. In short, there is no evidence which would begin to justify the extreme remedy of divestiture.